**Donna RATLIFF, Appellant (Plaintiff),**

v.

**Edward COHN, Appellee (Defendant).**

**No. 49S02–9710–CV–529.**

Supreme Court of Indiana.

March 27, 1998.

---

1. J. Scott Barratt, attorney number 2584–49, was originally admitted to practice law in Indiana on May 1, 1974. M. Scott Barratt, attorney number 10496–53, who was admitted to practice law in Indiana on May 30, 1980, is in no way involved in this disciplinary proceeding.

Richard A. Waples, JauNac M. Hanger, Waples & Hanger, Indianapolis, Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, for Appellant.

Jeffrey A. Modisett, Attorney General, Phillip D. Hatfield, Deputy Attorney General, Jon Laramore, Deputy Attorney General, Indianapolis, for Appellee.

Greta M. Rowland, Indianapolis, Juvenile Justice Task Force, Inc., Wayne O. Adams, III, David D. Robinson, Johnson, Smith, Pence, Densborn, Wright & Heath, Indianapolis, for Amicus Curiae Indiana Advocates For Children, Inc.

## ON PETITION TO TRANSFER

DICKSON, Justice.

On May 8, 1995, the appellant-plaintiff, fourteen-year-old Donna Ratliff, set fire to her family home, killing her mother and sixteen-year-old sister. Charged as an adult, she pled guilty to arson, a class A felony, and two counts of reckless homicide, class C felonies. The trial court ordered her to serve concurrent sentences of twenty-five years for arson and four years for each reckless homicide conviction. Although the trial court recommended placement in an alternative facility,[1] the Indiana Department of Corrections ("DOC") instead placed her in the Indiana Adult Women's Prison ("Women's Prison").[2] Once inside the Women's Prison, Ratliff was placed in the Special Needs Unit, separated from the general prison population.

---

1. A transcript from the sentencing hearing was not included in the record on appeal. These factual allegations are from Ratliff's complaint. As this appeal involves a Trial Rule 12(B)(6) motion to dismiss, we "take as true all well-pled material facts alleged in the complaint." *Culver–Union Township Ambulance Serv. v. Steindler*, 629 N.E.2d 1231, 1235 (Ind.1994).

2. Ratliff's appeal raises only the constitutionality of the DOC's original decision to place her in the Women's Prison. She does not ask us to consider whether, outside of these constitutional arguments, the DOC decision was appropriate. Accordingly, our opinion today addresses only the constitutional arguments regarding the DOC's decision placing her in the Women's Prison.

In her civil complaint against the Commissioner of the Indiana Department of Corrections ("the Commissioner"), Ratliff contended that the conditions of her incarceration violated the Indiana and United States Constitutions. She sought declaratory and injunctive relief requiring the Department of Corrections ("DOC") to transfer her from the Indiana Women's Prison to a rehabilitative juvenile treatment facility.

The Commissioner moved to dismiss the complaint under Trial Rules 12(B)(6) (failure to state a claim upon which relief can be granted) and 12(B)(1) (lack of subject-matter jurisdiction). Without specifying the basis for its ruling, the trial court granted the motion. Ratliff appealed and, in a cursory opinion, the Court of Appeals reversed, holding that Article 9, Section 2 of the Indiana Constitution "prohibits the incarceration of juveniles with adult prisoners." *Ratliff v. Cohn*, 679 N.E.2d 985, 988 (Ind.Ct.App. 1997).[3] We granted transfer.

### A. Trial Rule 12(B)(6) Dismissal for Failure to State a Claim upon which Relief Could be Granted

■ Ratliff contends that her complaint sufficiently alleges valid claims and, therefore, the trial court should have denied the defendant's motion to dismiss. In reviewing a dismissal under Trial Rule 12(B)(6), an appellate court must determine whether, in the light most favorable to the plaintiff and with every inference drawn in her favor, the complaint stated any set of allegations upon which the trial court could have granted relief to the plaintiff. *Cram v. Howell*, 680 N.E.2d 1096, 1096 (Ind.1997). Dismissals under Trial Rule 12(B)(6) are "rarely appropriate." *Obremski v. Henderson*, 497 N.E.2d 909, 910 (Ind.1986).

On appeal, Ratliff presents five state constitutional grounds[4] and three federal constitutional grounds[5] upon which she contends a trial court could grant relief. We address these grounds accordingly.

### 1. Institutions for Juvenile Offenders

■ Ratliff contends that Article 9, Section 2 of the Indiana Constitution, "[t]he General Assembly shall provide institutions for the correction and reformation of juvenile offenders,"[6] requires the State to place all juvenile offenders—irrespective of their crimes or background—in institutions separate from adult prisons.

■ Questions arising under the Indiana Constitution are to be resolved by "examining the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our Constitution, and case law interpreting the specific provisions." *Boehm v. Town of St. John*, 675 N.E.2d 318, 321 (Ind. 1996) (citing *Ind. Gaming Comm'n v. Moseley*, 643 N.E.2d 296, 298 (Ind.1994)). *See also Collins v. Day*, 644 N.E.2d 72, 76 (Ind. 1994); *Price v. State*, 622 N.E.2d 954, 963 (Ind.1993); *Bayh v. Sonnenburg*, 573 N.E.2d 398, 412 (Ind.1991), *cert. denied*, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 415 (1992). In construing the Constitution we "look to the history of the times, and examine the state of things existing when the Constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy." *Sonnenburg*, 573 N.E.2d at 412 (citing *State v. Gibson*, 36 Ind. 389, 391 (1871)).

At Indiana's constitutional convention in 1850–51, the following text for Article 9, Section 2 was proposed: "The General Assembly shall have the power to provide Houses of Refuge for the correction and reformation of juvenile offenders." *Comments of Delegate*

---

3. At oral arguments on December 9, 1997, the Deputy Attorney General noted that Ratliff is no longer in the Women's Prison. After the decision of the Court of Appeals that placement in the Women's Prison violated the Indiana Constitution, the DOC transferred custody of Ratliff to a private juvenile facility in Fort Wayne.

4. Ind. Const. art. 9 § 2; Ind. Const. art. 1 § 15; Ind Const. art. 1 § 16; Ind. Const. art. 1 § 18; and Ind. Const. art. 1 § 23.

5. U.S. Const. amend. XIV § 1 (Due Process Clause); U.S. Const amend. XIV § 1 (Equal Protection Clause); and U.S. Const. amend. VIII.

6. When adopted in 1851, the Indiana Constitution used the phrase "Houses of Refuge." It was amended in 1984 to delete "Houses of Refuge" and replace it with "institutions."

*Bryant* (Dec. 18, 1850), *in* 2 REPORT OF THE DEBATES AND PROCEEDINGS OF THE CONVENTION FOR THE REVISION OF THE CONSTITUTION OF THE STATE OF INDIANA, 1203 (Indiana Historical Collections Reprint, 1935). When this provision was subsequently discussed at the convention, Delegate James Bryant of Warren County moved to amend the proposed language to state that the General Assembly *shall provide* Houses of Refuge, "so as to make it obligatory upon the General Assembly to provide houses of refuge for juvenile offenders, instead of referring the subject to the discretion of that body, as proposed by the reported section." *Id.* at 1903 (Jan. 29, 1851). He justified this amendment by stating, "Since this Convention assembled, we have had a state of facts presented to us, such as I had previously no conception of." *Id.* That previously unknown information involved the fact that "more than one-eighth of the whole number" of convicts committed to the Indiana State prison from September, 1822, to November, 1850, "were minors within the age of twenty-one years, and some of these as young as *eleven* years of age." *Id.* (emphasis in original). Delegate Bryant described this as an "outrage upon civilization and humanity," concluding that he was "persuaded that if these facts had been spread before the public, such a deep disgrace to the character of Indiana would long since have been swept away by the fierce indignation of the people." *Id.*

Delegate Bryant then concluded that "the object of all punishment" was "two-fold: the prevention of crime and the reformation of the offender." *Id.* He questioned how the framers could "propose to diminish crime" or "reform offenders" with a system which sends "the children of the State, perhaps the victims of dissolute parents and neglected education, to this school of vice and infamy, where they cannot fail by means of the associations into which you thrust them, to be irretrievably ruined?" *Id.* He urged, "There is in this Convention, I am sure, but one feeling in regard to this matter, and that is, that this outrage upon all propriety and humanity shall no longer be." *Id.* He concluded, "With such facts before us, it is the imperative duty of the Convention to arrest this evil, to prevent this iniquitous system from being any longer tolerated, and to compel the General Assembly to provide institutions where these juvenile offenders can be restrained, and at the same time reformed." *Id.*

Delegate James Lockhart of Posey and Vanderburgh Counties echoed Delegate Bryant's indignation, arguing that "there is no question that can be presented for the consideration of this Convention, that is of more importance than this." *Comments of Delegate Lockhart* (Jan. 29, 1850), *in* 2 REPORT OF THE DEBATES AND PROCEEDINGS OF THE CONVENTION FOR THE REVISION OF THE CONSTITUTION OF THE STATE OF INDIANA, 1903 (Indiana Historical Collections Reprint, 1935). He noted that, "Having occupied for several years past a high judicial position, I have often been pained to see the youth, the mere boy, branded as a felon, under our laws, and sent for a series of years to that worst of all prisons in the United States—the Jeffersonville State prison." *Id.*

Delegate Bryant's amendment was adopted and the convention approved Article 9, Section 2. The resulting Constitution was thereafter ratified and became effective on November 1, 1851. *Governor's Proclamation Declaring Constitution in Force* (Sept. 3, 1851, *in* 1 CONSTITUTION MAKING IN INDIANA 1780–1850, § 149, at 420 (Charles Kettleborough, 1916)).

Clearly, there was strong support at the convention for significant change from the then-existing state of affairs regarding juvenile incarceration. We agree with Ratliff that Article 9, Section 2 "is unambiguous in requiring the legislature to provide institutions for the correction and reformation of juvenile offenders." Brief of Appellant at 11.

However, while the Constitution clearly requires the General Assembly to create a House of Refuge to provide alternative reformation and incarceration opportunities for juvenile offenders,[7] what is not clear is whether the framers intended that *every* ju-

---

7. The General Assembly fulfilled this mandate, opening the first House of Refuge in 1867. Such institutions remain in existence today and house many juvenile offenders.

venile convicted of an adult crime be sent to the House of Refuge.

Our review of the debates of the constitutional convention reveals no discussion of whether the House of Refuge should be the *exclusive* place for all juvenile offenders without regard to the nature of the juvenile's crime or the background of the juvenile offender. Noticeably absent from the text of Article 9, Section 2 is any adjective designating inclusivity, such as "*all* juvenile offenders," "*every* juvenile offender," "*any* juvenile offender," or "*each* juvenile offender." This absence is despite the fact that such adjectives were employed in many, if not most, other constitutional provisions.[8] Further, we

8. IND. CONST. art. 1 § 1 ("WE DECLARE that *all* people are created equal ... that *all* power is inherent in the People; and that *all* free governments are...."); IND. CONST. art. 1, § 2 ("*All* people shall be secured in the natural right to worship ALMIGHTY GOD, according to the dictates of their own consciences."); IND. CONST. art. 1, § 3 ("No law shall, in *any* case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience."); IND. CONST. art. 1, § 5 ("No religious test shall be required, as a qualification for *any* office of trust or profit."); IND. CONST. art. 1, § 9 ("No law shall be passed ... restricting the right to speak ... on *any* subject whatever; but for the abuse of that right, *every* person shall be responsible."); IND. CONST. art. 1 § 10 ("In *all* prosecutions for libel, the truth of the matters alleged to be libellous, may be given in justification."); IND. CONST. art. 1 § 12 ("*All* courts shall be open; and *every* person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law."); IND CONST. art. 1 § 13 ("In *all* criminal prosecutions, the accused shall have the right to a public trial...."); IND. CONST. art. 1, § 14 ("No person, in *any* criminal prosecution, shall be compelled to testify against himself."); IND. CONST. art. 1 § 16 ("*All* penalties shall be proportioned to the nature of the offense."); IND. CONST. art. 1 § 19 ("In *all* criminal cases whatever, the jury shall have the right to determine the law and the facts."); IND. CONST. art. 1 § 20 ("In *all* civil cases, the right of trial by jury shall remain inviolate."); IND CONST. art. 1 § 23 ("The General Assembly shall not grant to *any* citizen ... privileges or immunities, which, upon the same terms, shall not equally belong to *all* citizens."); IND CONST. art. 2 § 1 ("*All* elections shall be free and equal."); IND. CONST. art. 2 § 2 ("*Every* citizen of the United States, of the age of eighteen (18) years or more ... shall be entitled to vote in that precinct."); IND. CONST art. 2 § 6 ("*Every* person shall be disqualified from holding office, during the term for which he may have been elected, who shall have given or offered a bribe, threat, or reward, to procure his election."); IND. CONST. art. 2 § 11 ("In *all* cases in which it is provided that an office shall not be filled by the same person more than a certain number of years continuously, an appointment pro tempore shall not be reckoned a part of that term."); IND. CONST. art. 2 § 12 ("In *all* cases, except treason, felony, and breach of the peace, electors shall be free from arrest, in going to elections, during their attendance there, and in returning from the same."); IND. CONST. art. 2 § 13 ("*All* elections by the People shall be by ballot; and *all* elections by the General Assembly, or by either branch thereof, shall be viva voce."); IND. CONST. art. 2 § 14 ("*All* general elections shall be held on the first Tuesday after the first Monday in November...."); IND. CONST art. 4 § 1 ("The style of *every* law shall be: 'Be it enacted by the General Assembly of the State of Indiana;' and no law shall be enacted, except by bill."); IND CONST. art. 4 § 8 ("Senators and Representatives, in *all* cases except treason, felony, and breach of the peace, shall be privileged from arrest, during the session of the General Assembly, and in going to and returning from the same...."); IND. CONST. art. 4 § 18 ("*Every* bill shall be read, by title, on three several days, in *each* House ... and the vote on the passage of *every* bill or joint resolution shall be taken by yeas and nays."); IND. CONST. art. 4 § 20 ("*Every* act and joint resolution shall be plainly worded, avoiding, as far as practicable, the use of technical terms."); IND. CONST. art. 4 § 23 ("In *all* the cases enumerated in the preceding section, and in *all* other cases where a general law can be made applicable, *all* laws shall be general, and of uniform operation throughout the State."); IND. CONST. art. 4 § 27 ("*Every* statute shall be a public law, unless otherwise declared in the statute itself."); IND CONST. art. 5 § 14 ("*Every* bill which shall have passed the General Assembly shall be presented to the Governor."); IND. CONST. art. 5 § 21 ("The Lieutenant Governor shall ... have a right ... to vote on *all* subjects...."); IND. CONST art. 6 § 6 ("*All* county, township, and town officers, shall reside within their respective counties, townships, and towns...."); IND CONST. art. 6, § 7 ("*All* State officers shall, for crime, incapacity, or negligence, be liable to be removed from office...."); IND CONST. art. 6 § 8 ("*All* State, county, township, and town officers, may be impeached...."); IND. CONST. art. 7, § 4 ("The Supreme Court shall have, in *all* appeals of criminal cases, the power to review *all* questions of law and to review and revise the sentence imposed."); IND. CONST art. 7 § 11 ("*Every* such justice and judge shall retire at the age specified by statute...."); IND CONST art. 7 § 18 ("*All* criminal prosecutions shall be carried on in the name, and by the authority of the state; and the style of *all* process shall be: 'The State of Indiana.'"); IND CONST. art. 15 § 4 ("*Every* person elected or appointed to any office under this Constitution, shall ... take an oath or affirmation, to support the Constitution of this State, and of the United States....").

find no historical evidence of contemporaneous public expectation that the new constitution was intended to prohibit the incarceration of any and every juvenile offender in an adult prison. In fact, other than replicating the constitutional debates entries, our search in several contemporaneous newspapers [9] uncovered no mention of any public debate or constituent reaction to Article 9, Section 2.

The General Assembly initiated the implementation of Article 9, Section 2 four years after ratification with legislation declaring that, "[t]he Constitution of the State of Indiana requires that the General Assembly shall provide houses of refuge, for the correction and reformation of juvenile offenders, and whereas, common sense and common humanity demand that some steps should be taken at once within this State to separate the youthful convict from the veteran and hardened criminal.... " 1855 IND. ACTS CH. XCIII, Preamble. The Act provided that "the Governor, Treasurer of State, and Superintendent of Public Instruction ... are hereby authorized and directed to select and purchase for the State of Indiana ... an eligible site for a House of Refuge." *Id.* (§ 1). These state officials were directed to: (1) "procure plans, specifications, and estimates, for the building or buildings necessary for such House of Refuge;" (2) "prepare and mature a system for the management and government of such House of Refuge;" and (3) "ascertain what laws will be necessary to put the [House of Refuge] into successful operation." *Id.* (§ 3). The General Assembly provided some guidance to these officials, directing them to design the House of Refuge as "not simply a place of correction, but a reform school, where the young convict, separated from vicious associates may, by careful physical, intellectual, and moral training, be reformed and restored to the community, with purposes and character fitting him for a good citizen, an honorable, and honest man." *Id.* (§ 4). The resulting statutory scheme [10] created "an Institution to be known as the House of Refuge for Juvenile Offenders." 1867 IND. ACTS CH. LX[V]II, § 1. Its Superintendent was to "employ such methods of discipline as will, as far as possible, reform [the infants'] characters, preserve their health, promote regular improvement in their studies, trades and employments, and secure to them fixed habits of industry, morality and religion." *Id.* (§ 7).

Significantly, this legislation did not require that *all* youthful offenders be excluded from the state prison in favor of the House of Refuge. The statute provided the various "modes" by which the Institution would "receive into [its] care and guardianship infants under the age of eighteen years committed to their custody." *Id.* (§ 10). These modes were:

1. Infants committed by any Judge of a Circuit Court or Common Pleas Court on the complaint and due proof thereof, by the parent or guardian of such infant, that by reason of incorrigible or vicious conduct such infant has rendered his or her control beyond the power of such parent or guardian, and made it manifestly requisite, that from regard to the future welfare of such infant, and for the protection of society, he or she should be placed under such guardianship.

2. Infants committed by the authorities aforesaid, where complaint and due proof have been made that such infant is a proper subject for the guardianship of said institution, in consequence of vagrancy, or of incorrigible or vicious conduct, and that from the moral depravity, or otherwise, of the parent or guardian in whose custody

---

9. Including *The Indiana State Sentinel, The Indiana State Journal, The Evansville Weekly Journal, The Fort Wayne Times,* and *The Fort Wayne Sentinel.*

10. That the enactment was a product of study and efforts following the 1855 legislative directive is evidenced by the Governor's message to the General Assembly during the 1867 term, in which he discussed the constitutional mandate to create a House of Refuge and noted that there had been "much attention and labor upon the subject" and that he had been given "valuable communications, which I herewith lay before you, together with reports and documents setting forth the character and operations of the Reform Schools in New York, Ohio, and Illinois." *Address of Governor Conrad Baker* (January 11, 1867) JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE STATE OF INDIANA DURING THE FORTY-FIFTH REGULAR SESSION OF THE GENERAL ASSEMBLY, PART 1 at 30 (1867).

such infant may be, such parent or guardian is incapable or unwilling to exercise the proper care or discipline over such incorrigible or vicious infant.

3. Infants who are destitute of a suitable home and of adequate means of obtaining an honest living, or who are in danger of being brought up to lead an idle and immoral life, and who may be committed to the guardianship of said Institution by the Trustees of the township where such infant resides, or by the mother, when the father is dead or has abandoned his family, or is an habitual drunkard, or does not provide for their support.

*Id.*

In addition to these enumerated "modes," the statute also provided one other means by which an infant could be sent to the Institution:

Any infant under the age of eighteen years, who shall under [state] laws ... be liable to confinement in the jail [or] penitentiary ... *may, at the discretion of the Court or Jury trying the cause,* be placed in such Institution, until of legal age, under the exclusive control and guardianship of the ... Institution.

*Id.* (§ 11) (emphasis added).

In creating the House of Refuge, the General Assembly required that, before an infant could be placed in the Institution, "the person or persons having charge of said infants, shall ascertain from the Superintendent *whether* they can be received." *Id.* (§ 15) (emphasis added). In situations when the infants could not be received into the Institution because they did not fall into one of the designated placement modes, the Act provided: "[If the infants] cannot be received into said Institution, the cases of such infants shall be disposed of as if this act had never been passed and no proceedings taken under it." *Id.* (§ 15).

It is clear from these statutes [11]—the first enacted to initiate the implementation Article 9, Section 2 and the second enacted to fulfill that constitutional mandate—that the General Assembly did not believe that its constitutional mandate required *every* infant to be housed in the Institution rather than in the State Prison. Furthermore, we find nothing in our review of contemporaneous writings and reports to indicate any public protest— or even any discussion—regarding the fact that the House of Refuge would not serve as the *exclusive* place for juvenile incarceration.

It also appears from our independent review of prison records that significant numbers of youthful offenders continued to be incarcerated in adult prison even after the creation of the House of Refuge. The "Annual Reports of the Officers and Directors of the Indiana State Prison" and the original Department of Correction Indiana State Prison logs reveal that, from 1836 through 1850—before the constitutional convention— at least two twelve-year-olds, three fourteen-year-olds, three fifteen-year-olds, five sixteen-year-olds, and thirteen seventeen-year-olds were sentenced to incarceration in the Indiana State Prison.[12] INDIANA STATE PRISON LOGS: DESCRIPTIVE LIST OF CONVICTS ON THE STATE PRISON OF INDIANA, Volume B, 1836–1855 (*original logs located in* The Indiana Commission on Public Records, Indiana State Archives).

Significantly, during the five years *after* the House of Refuge was created, a substantial number of juvenile offenders were still being sentenced to the adult prison. In fact, in the five years after the House of Refuge was created, those juveniles who were sentenced to the adult prison were even younger and greater in number than those sentenced during the fourteen years preceding the constitutional convention. New incarcerations included at least 129 juveniles: three eleven-year-olds, two twelve-year-olds, four thirteen-year-olds, ten fourteen-year-olds, eleven fifteen-year-olds, thirty-four sixteen-year-olds, and sixty-five seventeen-year-olds.[13]

---

11. 1855 IND. ACTS CH. XCIII; 1867 IND. ACTS CH LX[V]II.

12. The juveniles were incarcerated for murder (two), manslaughter (three), arson (one), rape (one), burglary (two), grand larceny (six), obstruction (one), stealing from a post office (one), petit larceny (nine).

13. These juveniles were incarcerated for murder (two), manslaughter (two), arson (one), rape (three), burglary (fifteen), forgery (one), robbery (five), grand larceny (eighty-four), assault and

*Annual Report of the Officers and Directors of the Indiana State Prison,* DOCUMENTARY JOURNAL OF INDIANA (1867–1872); INDIANA STATE PRISON LOGS: DESCRIPTIVE LIST OF CONVICTS ON THE STATE PRISON OF INDIANA, Volume 1, 1869–1877 *(original logs located in* The Indiana Commission on Public Records, Indiana State Archives).[14]

Several other items hold particular historical significance. Of these 129 juveniles sentenced to adult prison after the House of Refuge opened, only 22 were thereafter transferred to the House of Refuge after serving part of their sentences in prison.

Additionally, as the framers intended, the ratification of Article 9, Section 2 and the ultimate creation of a House of Refuge had a *substantial* impact on juveniles incarcerated in adult prisons, despite the fact that *all* juveniles were not incarcerated in juvenile institutions. Prior to the ratification of Article 9, Section 2, juveniles who committed relatively *minor* offenses were incarcerated with adult criminals who had committed much more serious offenses. In fact, from 1836 to 1850, the most common crime leading to juvenile incarceration in the adult prison was the minor offense of petit larceny. However, after the House of Refuge was created in 1867, the numbers of juveniles incarcerated in adult prisons for minor offenses dropped dramatically, with juveniles incarcerated in adult prisons primarily for more serious offenses, such as grand larceny and burglary.[15]

Citing Acts 1945, Chapter 356, Section 22, Ratliff asserts that, "[i]t was not until 1945 that the Indiana General Assembly finally fulfilled its constitutional mandate by statutorily prohibiting the placement of juveniles in adult institutions." Brief of Appellant at 11. This is an inaccurate representation of the Act of 1945. While *one sentence* of the Act provides that juveniles should not be detained in prison, the *next sentence* specifically provided exceptions to this prohibition: "[A] child, whose habits or conduct are deemed such as to constitute a menace to other persons, *may ... be placed in jail or other place of detention for adults,* but in a room or ward separate from adults." 1945 IND. ACTS 346 § 22 (emphasis added). Since the Constitution was ratified in 1851, there has never been a comprehensive statutory prohibition against incarcerating certain juveniles in adult prisons.

Further, in 1982 and 1983, successive resolutions by the 102nd and the 103rd General Assemblies recommended that Article 9, Section 2 be amended, substituting "institutions" for "Houses of Refuge." *See* Pub.L. No. 231–1982; Pub.L. No. 383–1983. The amended Article 9, Section 2 was adopted at the general election held Nov. 6, 1984.[16] At the time the amended Article 9, Section 2

---

battery with intent to rape (one), receiving stolen goods (one), and petit larceny (fourteen).

**14.** In his article reviewing the historical context in which juvenile courts were created in Indiana, Justice Sullivan noted the non-exclusive nature of sentencing juveniles in the years after the constitutional convention:

At the end of the 19th century, this country's courts treated children accused of crimes the same as adult offenders.... Like the rest of the country, Indiana made no distinction between the adult and the child. Indiana made no special provision for separate confinement for children pending trial, the hearing of their cases, or their final disposition. If guilty, children might share incarceration with men and women in jail or a workhouse. In more serious cases, they might be transferred to the criminal court or be sentenced to the Indiana Boys' School or the Industrial School for Girls. Frank Sullivan, Jr., *Indiana as a Forerunner in the Juvenile Court Movement,* 30 IND.L.REV. 279,

279 (1997) (footnotes omitted). In 1889, the General Assembly began revising its treatment of juveniles, culminating in 1903 with the creation of our juvenile court by virtue of Indiana Juvenile Court Act. *See* 1903 IND.ACTS ch. 237, § 4. This Act specifically provided that, "If the child was found guilty of the offense charged and appeared to the court to be 'wilfully wayward and unmanageable,' send the child to [the Houses of Refuge] *or to any state penal or reformatory institution."* *Id.* at 298 (emphasis added).

**15.** In the five years after a House of Refuge was opened, 77% of the juvenile population was incarcerated for either grand larceny or burglary and only 10% was incarcerated for petit larceny, compared to years prior to 1850 when the most common juvenile crime leading to incarceration was petit larceny (35%).

**16.** The current provision reads, "The General Assembly shall provide institutions for the correction and reformation of juvenile offenders." IND CONST. art. 9 § 2.

was ratified, the Juvenile Code did not prevent the incarceration of juveniles who were waived to adult court. *See* IND.CODE § 31–6–1–1 *et seq.* (1982). Despite the opportunity to include language in the new provision reflecting that "all," "every," "any," or "each" juvenile must be incarcerated only in juvenile institutions, no such language was included.

■ Considering the absence of all-inclusive language in the constitutional text, the debates at the constitutional convention, the implementing legislation enacted shortly after the adoption of the Constitution, and the language retained when the provision was amended in 1984, we hold that, although Article 9, Section 2 clearly requires that the General Assembly provide institutions for juvenile offenders, it does not require that *all* juveniles—irrespective of their crimes or background—be housed only in such institutions. *Accord Hunter v. State,* 676 N.E.2d 14 (Ind.1996) (addressed in detail *infra* under Article 1, Section 18). We are cognizant that, "in our role as guardian of the constitution, we are nevertheless a court and not a 'supreme legislature.'" *Bunker v. Nat'l Gypsum,* 441 N.E.2d 8, 11 (Ind.1982). "The legislature has wide latitude in determining public policy, and we do not substitute our belief as to the wisdom of a particular statute for those of the legislature." *State v. Rendleman,* 603 N.E.2d 1333, 1334 (Ind.1992).

This case is analogous to *Y.A. Fleener v. Bayh,* 657 N.E.2d 410 (Ind.Ct.App.1995), *trans. denied,* wherein the plaintiffs challenged the state's practice of not providing appropriate residential placements for *all* children who are mentally ill, in violation of Article 9, Section 1 of the Indiana Constitution. Similar to the provision at issue here (Article 9, Section 2), Article 9, Section 1 provides that, "It shall be the duty of the General Assembly to provide, by law, for the

support of institutions . . . for the treatment of the insane." IND. CONST. art. 9 § 1. The Indiana Court of Appeals rejected the plaintiff's argument that "the constitution places upon the General Assembly the absolute duty to care for the members of this class." *Y.A. Fleener,* 657 N.E.2d at 417. The court found that:

> At the risk of being too simplistic in our response to this argument, we merely state that the constitutional provision is not without limitations. These limitations may be imposed by common sense, and by the constraints placed upon government to wisely distribute and apportion available funds among the various needs and programs which exist and which must be established for the welfare of all citizens. In short, the constitutional provisions are to be construed in the light of reason and the logical intendment of the framers.
>
> The General Assembly, however, may not avoid the very real intendment of the constitutional mandate to care for the mentally ill and disturbed, by refusing to raise and appropriate adequate funds to provide not unlimited care, but adequate care. In the same vein, if the General Assembly has appropriated adequate funds and has appropriately delegated to the executive branch of state government the duty and responsibility for implementing an[d] carrying out the programs to meet the needs, then the executive may not refuse to carry out its responsibility.

*Id.* The court then found that the *"unlimited* care sought by plaintiffs in this lawsuit" was not required. *Id.* at 418 (emphasis added).[17]

Because Article 9, Section 2 does not require the placement of all juveniles in a separate juvenile facility, Ratliff's claim that her incarceration in the Women's Prison vio-

---

17. The conclusions of the *Fleener* court are also applicable to this case:

> While we might agree with plaintiffs that provision for only 400 of the some 7,000 children needing residential care, seems, on its face woefully inadequate, we are not at liberty to fashion a degree of care for a particular segment of the class, nor are we enabled to direct the General Assembly to raise funds adequate for the executive to care for all mem-

> bers of the class in an unlimited fashion. While it may be of little or no consolation to an emotionally disturbed youngster who needs but cannot obtain state funded care, the answer seems to lie in the elective process. The citizens of the state who select the legislators and the public officials who implement and direct the various programs required, may make their voices heard.

*Y.A. Fleener,* 657 N.E.2d at 417–18.

lates this provision does not state a claim upon which relief could be granted.

## 2. Confinement with Unnecessary Rigor

█ Ratliff contends that her incarceration in the Women's Prison violated Article 1, Section 15 of the Indiana Constitution, which provides that, "No person ... confined in jail, shall be treated with unnecessary rigor." IND. CONST. art. 1 § 15.

The essence of Ratliff's complaint is that her placement [18] in the Special Needs Unit of the Women's Prison "deprived her of adequate rehabilitative treatment during her incarceration." Record at 16 (Complaint of Donna Ratliff, ¶ 23). Ratliff contends that she was "physically, sexually, and emotionally abused by various family members since the age of four." Id. 13 (¶ 7). She contends that the Special Needs Unit is comprised of women who " 'display severe psychological disorders' and are incapable of functioning in an open population setting" and that the inmates in this Unit are "seriously mentally ill or ... have severe anger problems." Id. at 14–15 (¶ 15).

Her treatment in adult prison included "ninety minutes a month in individual consultation with the prison psychologist" and of participating in two one-hour group therapy sessions, one dealing with "sexually-abused women who have unresolved issues contributing toward criminal behavior" and another dealing with "issues of personal responsibility, behavioral change and complicated grief among women who have taken the life of a significant other." Id. at 15 (¶ 17). Although she does not take issue with the individualized treatment she has received in her consultations with the prison psychologist, she contends the group sessions have been "inappropriate for dealing with [her] psychological problems and have had an adverse impact on [her] rehabilitation" because she "does not share like experiences with these adult offenders, or have the benefit of sharing therapy with her peer group" and that others "have shown hostility and resentment toward [her] when she has participated in the group, and prison officials have ad-

monished her to refrain from sharing her experiences as a victim of child abuse with the group." Id. at 15 (¶ 18).

Cases recognizing violations of Article 1, Section 15 involve situations where a prisoner was tortured, had a tooth knocked out, was repeatedly beaten, kicked, and struck with a blackjack and beaten with a rubber hose while he was stretched across a table, *Kokenes v. State,* 213 Ind. 476, 13 N.E.2d 524 (1938), where a prisoner was beaten with police officer's fists in both eyes, cut on the top of his head, and beaten with a rubber hose on the head and ears, *Bonahoon v. State,* 203 Ind. 51, 178 N.E. 570 (1931), and where a prisoner was severely injured after being shot by police during a protest, *Roberts v. State,* 159 Ind.App. 456, 307 N.E.2d 501 (1974).

Ratliff's treatment in prison, as asserted in her complaint, does not rise to the level of the "unnecessary rigor" contemplated by Article 1, Section 15. Ratliff's complaint has not stated a claim under Article 1, Section 15 upon which relief can be granted.

## 3. Penal Code, Reformation, and Vindictive Justice

█ Emphasizing the constitutional debates, Ratliff contends that her incarceration in the Women's Prison contravenes the rehabilitation principle of our penal laws as mandated by Article 1, Section 18, which provides. "The penal code shall be founded on the principles of reformation, and not of vindictive justice." IND. CONST. art. 1 § 18.

We recently addressed this claim in *Hunter v. State,* 676 N.E.2d 14 (Ind.1996), wherein a sixteen-year-old boy contended that "his incarceration with older, hardened criminals violates Article I, § 18 of the Indiana Constitution ... [maintaining] that the debates of Indiana's constitutional convention of 1850 reveal that this provision was meant to prevent the incarceration of young offenders under the age of twenty-one years with older, hardened criminals." Id. at 16. We rejected this contention under both Article 1,

---

**18.** As we noted above, Ratliff is no longer in the Women's Prison. She is in a private juvenile facility in Fort Wayne.

Section 18 and Article 9, Section 2, finding that:

> [T]he comments of the delegates reflect a patent intent to accommodate reformation of youths by separating them from hardened criminals who are purportedly not as susceptible to redemption. The legislature has not frustrated this intent by setting up a statutory scheme that prohibits most youths from being confined to an adult correctional facility. The only youths who are not subject to this general rule are youths alleged to have committed the most serious and violent crimes. We find it well within the legislature's purview to conclude that this system better accommodates the purposes behind Article I, § 18 and Article 9, § 2, because it segregates younger and less violent offenders from the most violent offenders, regardless of age.

*Id.* at 17.

Ratliff contends that reliance upon *Hunter* is inappropriate for several reasons. Citing the same debates at the convention as we noted above, she argues that *Hunter* should be overruled because "[t]he historical record does not support" its conclusion. Appellant's Brief in Response to Petition to Transfer at 6. She is incorrect.

Ratliff also argues that *Hunter* should be overruled because it has no limiting principle, as it "does not provide this Court with a principled basis to approve or disapprove any particular class of excluded juveniles." *Id.* In the alternative, she argues that *Hunter* should be distinguished because the defendant in *Hunter* was a sixteen-year-old male, was a violent offender with a criminal record, and was convicted of murder and burglary, whereas Ratliff is a fourteen-year-old female, a first-time offender, and was convicted of arson and two counts of reckless homicide.

▉ However, such particularized, individual applications are not reviewable under Article 1, Section 18 because Section 18 applies to the penal code *as a whole* and does not protect fact-specific challenges.[19] *Lowery v. State*, 478 N.E.2d 1214, 1220 (Ind.1985)

(Article 1, Section 18 "applies to the penal laws *as a system* to insure that these laws are framed upon the theory of reformation as well as the protection of society.") (emphasis added), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986). *See also Driskill v. State*, 7 Ind. 338, 342–43 (1855).

Article 1, Section 18 does not prevent juveniles from being placed in the Women's Prison. As to this issue, Ratliff has failed to state a claim upon which relief may be granted.

### 4. Cruel and Unusual Punishment

Ratliff contends that her incarceration in the Women's Prison violates Article 1, Section 16 of the Indiana Constitution, which provides that "Cruel and unusual punishments shall not be inflicted," IND. CONST. art. 1 § 16, and the Eight Amendment to the United States Constitution, which also prohibits "cruel and unusual punishments." U.S. CONST. amend. VIII.

▉ Article 1, Section 16 of the Indiana Constitution does not entitle a person convicted of a crime in Indiana to any identifiable right to assignment to a particular institution. *Barnes v. State*, 435 N.E.2d 235, 242 (Ind.1982) (rejecting a defendant's claim that, because he previously had been a police informant, which could result in his being killed by other prisoners, his confinement in a state prison was cruel and unusual). "Generally, the constitutional prohibitions against cruel and unusual punishments . . . are proscriptive of atrocious or obsolete punishments and are aimed at the kind and form of the punishment, rather than the duration and amount." *Wise v. State*, 272 Ind. 498, 502, 400 N.E.2d 114, 117 (1980). Punishment violates Article 1, Section 16 only if it "makes no measurable contribution to acceptable goals of punishment, but rather constitutes only purposeless and needless imposition of pain and suffering." *Douglas v. State*, 481 N.E.2d 107, 112 (Ind.1985) (rejecting the argument that the imposition of a thirty-year sentence for a sixteen-year-old

**19.** Additionally, *Hunter* was not a fact-specific challenge to the named juvenile's incarceration in adult prison. *Hunter* rejected the plaintiff's broad and generalized claim that "under Article

1, § 18 of the Indiana Constitution, all youths under the age of twenty-one years must be confined in a separate facility." *Hunter*, 676 N.E.2d at 16.

boy constituted cruel and unusual punishment).

■ Ratliff's complaint contends that her incarceration in the Women's Prison was cruel and unusual punishment because she has been abused her whole life, was isolated from her peers in the prison, and her primary treatment was group therapy sessions with adult "sexually-abused women who have unresolved issues contributing toward criminal behavior." [20] Record at 15 (Complaint of Donna Ratliff, ¶ 17).

Considering the serious offenses which Ratliff committed—setting fire to her home and killing her mother and sister—her isolation from peers and the counseling sessions she attends contribute to acceptable goals of punishment. Thus, her incarceration in the Women's Prison was not devoid of any "measurable contribution to acceptable goals of punishment," *Douglas*, 481 N.E.2d at 112, nor was it "atrocious or obsolete punishment[ ]." *Wise*, 272 Ind. at 502, 400 N.E.2d at 117. Under these cases, Ratliff has not established an Article 1, Section 16 violation.[21] Thus, she has failed to state a claim upon which relief may be granted.

■ Ratliff also contends that the Eighth Amendment to the Constitution of the United States was violated because community standards are moving away from incarcerating juveniles under sixteen years of age in adult prisons. A 1995 United States Department of Justice study indicates that, while a majority of the states currently incarcerate juvenile offenders with adults (58%), only 38% of those states actually incarcerate juvenile offenders under the age of sixteen in adult prisons. Ratliff argues that, "once a punishment has been rejected by a sufficiently large number of state legislatures, it can no longer be said that it is consistent with society's standards of decency" and, therefore, violates the Eighth Amendment. Brief of Appellant at 16. In response, the State cites several articles and contends that the opposite is true, arguing that "the national trend has been toward harsher penalties for juveniles and toward incarcerating juveniles convicted of adult crimes away from other juveniles." Brief of Appellee In Support of Transfer at 11.

We remain unconvinced that the practice of incarcerating juvenile offenders under the age of sixteen in the adult prison necessarily violates the Eighth Amendment. Of the majority states which incarcerate juveniles in prison, close to 40% also incarcerate in adult prison those under the age of sixteen. This is hardly a "reject[ion] by a sufficiently large

---

20. However, we note that she also received "ninety minutes a month in individual consultation with the prison psychologist." Record at 15 (Complaint of Donna Ratliff, ¶ 17).

21. Ratliff also cites *Conner v. State*, 626 N.E.2d 803 (Ind.1993) for the proposition that, "Article I, § 16 provides even broader protection against cruel and unusual punishment than does the Eighth Amendment." Brief of Appellant at 17. As the State correctly notes, this is not an accurate reading of *Conner*, nor of our Article 1, Section 16 jurisprudence. In *Conner* we addressed a portion of Article 1, Section 16 not at issue here: "All penalties shall be proportioned to the nature of the offense." IND. CONST. art 1 § 16. This particular provision has no counterpart in the federal constitution. Thus, we noted, "This provision goes beyond the protection against cruel and unusual punishment contained in the Eighth Amendment to the U.S. Constitution." *Conner*, 626 N.E.2d at 806. In the case before us, we are not faced with a proportionality challenge. Thus, case law cited by Ratliff addressing Article 1, Section 16 in that context is inappropriate.

In addition, citing *Reed v. State*, 479 N.E.2d 1248 (Ind.1985), Ratliff mistakenly asserts that this Court has interpreted Section 16 to require the State "to take reasonable precautions to preserve the life, health and safety of its prisoners." Brief of Appellant at 18. The defendant in *Reed* argued that, due to his age (18) and slight build, sentencing in a maximum security facility would be cruel and unusual punishment in violation of Article 1, Section 16. This Court found the issue waived for failure to raise the question at trial. *Id.* at 1254.

Finally, Ratliff argues that, when "construed in combination with the prohibition of unnecessary rigor contained in Article I, § 15, the requirement in Article I, § 18 that the state's penal laws shall be based on principles of rehabilitation and not vindictive justice, coupled with the explicit requirement for juvenile institutions contained in Article IX, § 2," Article 1, Section 16 "should provide greater protections in her case." Brief of Appellant at 18. Because we have rejected her claims regarding each of the above provisions, this argument fails.

number of state legislatures."[22] *Id.* We find that, "[t]his is a question of public policy rather than a constitutional question and thus is an argument to be made to the legislative body rather than to a judicial tribunal." *Miller v. State,* 623 N.E.2d 403, 411 (Ind. 1993) (rejecting an Eighth Amendment cruel and unusual punishment challenge).

Ratliff also contends that the incarceration of "a young girl who has been abused her whole life . . . where her primary treatment is group therapy sessions with adults who have been convicted of abusing children," constitutes cruel and unusual punishment in violation of the Eighth Amendment. Brief of Appellant at 15. This was extensively addressed by the Federal District Court for the Eastern District of California in *Madrid v. Gomez,* 889 F.Supp. 1146 (N.D.Cal.1995), *mandamus denied sub nom., Wilson v. U.S. Dist. Court for the E. Dist. of Cal.,* 103 F.3d 828 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1823, 137 L.Ed.2d 1031 (1997), a case where prison inmates brought a civil rights action[23] alleging, among other things, that the state denied them adequate mental health treatment.

The court began by noting that, under the Eighth Amendment, "It is firmly established that 'medical needs' include not only physical health needs, but mental health needs as well." *Id.* at 1255 (citations omitted). "As far back as 1977, the Fourth Circuit observed that there is 'no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart.'" *Id.* (citing *Bowring v. Godwin,* 551 F.2d 44, 47 (4th Cir.1977)).[24]

To establish an Eighth Amendment violation, Ratliff "must demonstrate that prison officials are 'deliberately indifferent' to [her] 'serious' medical needs...."[25] *Id.* (citing *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251, 261 (1976); *Toussaint v. McCarthy,* 801 F.2d 1080, 1111 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987)).

[T]o prove deliberate indifference, plaintiffs must demonstrate not only that the levels of medical and mental health care are constitutionally inadequate from an objective standpoint ... but also that defendants (1) knew the risk to inmate health that this inadequacy posed, and (2) acted with disregard for this risk. In short, plaintiffs must show that defendants "'consciously disregard[ed]' a substantial risk of serious harm" to plaintiffs' health or safety. Accidental or inadvertent failure to provide adequate care will not suffice.

*Madrid,* 889 F.Supp. at 1256 (citing *Farmer v. Brennan,* 511 U.S. 825, 839, 114 S.Ct. 1970,

---

22. Even were there a strong trend, we addressed a similar argument in *Harrison v. State,* 644 N.E.2d 1243 (Ind.1995), wherein the defendant contended that the death by electrocution is cruel and unusual punishment, arguing that public sentiment towards electrocution had changed in recent years. *Id.* at 1258. We held, "While we recognize the strong national trend toward lethal injection as the most appropriate form of capital punishment ... execution of a death sentence by electrocution does not violate the Eighth Amendment of the United States Constitution or Article 1, § 16, of the Indiana Constitution." *Id.* (footnote omitted).

23. In her complaint, Ratliff states that her claim is a "civil rights action to enforce the ... federal constitution[]." Record at 12 (Complaint of Donna Ratliff, ¶ 3). She sued the Commissioner of the Department of Correction "in his individual and official capacities under plaintiff's federal claim." *Id.* at 13 (¶ 5). She alleged that his actions "were taken under color of state law," *id.* at 16 (¶ 22) and that the Due Process Clause of the Fourteenth Amendment was violated. *Id.* at 12, 14 (¶¶ 1, 14). As in *Madrid,* this is sufficient

to raise this claim. *See Matter of Tina T.,* 579 N.E.2d 48, 62 (Ind.1991) ("A claim for relief under § 1983 need allege only that some person acting under color of state law has deprived the claimant of a federal right.").

24. However, "[t]he Eighth Amendment does not require that prison officials provide the most desirable medical and mental health care; nor should judges simply 'constitutionalize' the standards set forth by professional associations such as the American Medical Association or the American Public Health Association." *Madrid,* 889 F.Supp. at 1256 (citations omitted).

25. "Indicia of 'serious' medical need include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain....'" *Madrid,* 889 F.Supp. at 1255 n. 201.

1979, 128 L.Ed.2d 811, 824 (1994); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239).

■ Trial Rule 12(B)(6) requires that the complaint state *any* set of allegations upon which the trial court could have granted relief. *Cram v. Howell*, 680 N.E.2d 1096, 1096 (Ind.1997). Ratliff's complaint alleges that she was "physically, sexually, and emotionally abused by various family members since the age of four" and that she had been hospitalized for psychiatric treatment on two separate occasions in the two years prior to her offense. Record at 13 (Complaint of Donna Ratliff, ¶ 7). According to her complaint, a court psychologist recommended that she be placed in an alternative setting because "important aspects of her rehabilitation might not occur if she were placed in an adult prison...." *Id.* at 14 (¶ 10). Ratliff alleges that the Commissioner, despite knowledge of this information, "rejected concerns made by numerous concerned citizens and affirmed Donna's placement at the Indiana Women's Prison." *Id.* at 14 (¶ 10).

Her complaint asserts that she was placed in the Special Needs Unit of the Women's Prison, which is comprised of women who " 'display severe psychological disorders' and are incapable of functioning in an open population setting" and that the inmates in this Unit are "those who are seriously mentally ill or who have severe anger problems." *Id.* at 14 (¶ 15). She complains that her group therapy sessions [26] have been "inappropriate for dealing with [her] psychological problems and have had an adverse impact on [her] rehabilitation." *Id.* at 15 (¶ 18). She alleges that "prison officials have admonished her to refrain from sharing her experiences as a victim of child abuse with the group," that she "has been subjected to hostility and threats by adult inmates participating in these therapy sessions ... and fears for her safety," and that "She has been sexually propositioned and harassed by older inmates." Record at 15 (Complaint of Donna Ratliff, ¶¶ 18, 19).

As previously noted, although we express no opinion as to the merits of Ratliff's claims, our review of the trial court's dismissal requires that we view it in the light most favorable to the plaintiff and with every inference drawn in her favor. *Cram v. Howell*, 680 N.E.2d 1096, 1096 (Ind.1997). Because Ratliff's complaint essentially alleges that prison officials have been deliberately indifferent to her serious medical needs, her complaint is sufficient to withstand a Trial Rule 12(B)(6) motion to dismiss for failure to state a claim as to this aspect of her Eighth Amendment claim.

### 5. Privileges, Immunities, and Equal Protection

Ratliff contends on appeal that, because she was not provided age-appropriate counseling and peer group therapy, her incarceration in the Women's Prison has violated Article 1, Section 23 of the Indiana Constitution, which provides that, "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens," IND. CONST. art. 1 § 23, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, which provides that states cannot "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. She did not argue this claim before the trial court.

This is an appeal from the grant of a Trial Rule 12(B)(6) motion and our review on appeal is limited to whether the complaint stated any set of allegations upon which the trial court could have granted relief. In her *appellate brief*, Ratliff bases her constitutional claims upon factual comparisons between the treatment that she received while confined in an adult prison and the treatment received by juveniles confined in juvenile institutions. However, in her *complaint*, she makes no

26. Her treatment in prison consists of participating in two one-hour group therapy sessions, one dealing with "sexually-abused women who have unresolved issues contributing toward criminal behavior" and another dealing with "issues of personal responsibility, behavioral change and complicated grief among women who have taken the life of a significant other." Record at 15 (Complaint of Donna Ratliff, ¶ 17). She also receives ninety minutes a month in individual consultation with the prison psychologist. *Id.*

such factual assertions regarding the treatment received by juveniles confined in juvenile institutions. Thus, on the face of her complaint, she has not stated a claim under which relief could be granted.

### 6. Due Process

Ratliff contends that her complaint alleged facts sufficient to state a claim under the Due Process Clause of the Fourteen Amendment to the United States Constitution, which provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV.

Citing *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), she argues that "[c]hildren in custody of the state have the right to minimally adequate care and treatment under the Fourteenth Amendment." Brief of Appellant at 19. The plaintiff in *Youngberg* was involuntarily committed to a state institution for the mentally retarded and brought a Section 1983 claim contending, in essence, that his substantive due process rights were violated by: (1) the institution's lack of safe conditions of confinement; (2) its practice of restraining him for long periods of time; and (3) the lack of appropriate treatment[27] for his mental retardation. *Id.* at 311, 102 S.Ct. at 2455, 73 L.Ed.2d at 34. The Court noted that it had already held that involuntarily committed and incarcerated individuals have a Fourteenth Amendment liberty interest in adequate food, shelter, clothing, and medical care. Thus, *Youngberg* addressed the new question of whether liberty interests for such individuals also exist in safety, freedom of movement, and treatment. *Id.* at 315, 102 S.Ct. at 2458, 73 L.Ed.2d at 37.

The Court quickly found that the first two claims involved general liberty interests recognized by its prior decisions and that "involuntary commitment proceedings do not extinguish" those interests. *Id.* However, rather than address whether a broad liberty interest in treatment existed under the Fourteenth Amendment, the Court addressed only the more specific claim for treatment "to ensure safety and freedom from undue restraint." *Id.* at 319, 102 S.Ct. at 2460, 73 L.Ed.2d at 39 ("[T]his case does not present the difficult question whether a mentally retarded person, involuntarily committed to a state institution, has some general constitutional right to training [treatment] per se . . . ."). Thus, the Court held that, in addition to previously recognized liberty interests in adequate food, shelter, clothing, and medical care, an involuntarily committed person also enjoys constitutionally protected due process interests in: (1) conditions of reasonable care and safety; (2) reasonably nonrestrictive confinement conditions; and (3) such treatment as may be required to secure these conditions of reasonable care and safety and nonrestrictive confinement.[28] *Id.* at 324, 102 S.Ct. at 2462, 73 L.Ed.2d at 42–43.

On appeal, Ratliff contends that her due process rights have been violated because the treatment provided her in the adult prison "is without rehabilitative purpose and is having a detrimental impact on her psychologically and emotionally." Brief of Appellant at 19. However, despite her general claim of entitlement to minimally adequate care and treatment while in custody, the Supreme Court has not extended such entitlement beyond the treatment required to ensure reasonable care and safety and reasonably nonrestrictive confinement. *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462, 73 L.Ed.2d at 42–43. As a result, to survive a Trial Rule 12(B)(6) motion to dismiss, Ratliff's complaint must present a claim that she

---

27. The terms treatment, training, habilitation, and programs are used synonymously throughout the opinion. *See Youngberg*, 457 U.S. at 311, 102 S.Ct. at 2455, 73 L.Ed.2d at 34 ("[Plaintiff] uses 'treatment' as synonymous with 'habilitation' or 'training.'"). The Court primarily used the words "training" and "habilitation" in its opinion, noting that "The word 'habilitation,' . . . is commonly used to refer to programs for the mentally-retarded because mental retardation is . . . a learning disability and training impairment rather than an illness. [T]he principal focus of

habilitation is upon training and development of needed skills." *Id.* at 309, 102 S.Ct. at 2454, 73 L.Ed.2d at 33.

28. The Court found that, with regard to this third liberty interest, the State must provide such treatment "as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints." *Id.* at 324, 102 S.Ct. at 2462, 73 L.Ed.2d at 42–43.

has been denied treatment which would lead to her reasonable care and safety or freedom from restrictive confinement.[29]

As we have noted above, Ratliff contends that she was physically, sexually, and emotionally abused. Record at 13 (Complaint of Donna Ratliff, ¶ 7). She contends that the treatment she receives in the Women's Prison is inadequate because her groups include women with whom she does not share "like experiences" and that she does not have the benefit of being in therapy "with her peer group." *Id.* at 15 (¶ 18). These complaints allege only inadequate treatment generally, not that she has been denied treatment which would lead to her reasonable care and safety freedom from restrictive confinement. Thus, dismissal as to this claim was appropriate.

■ Nonetheless, Ratliff did raise a general Due Process Clause violation in her complaint and also alleged that she "has been subjected to hostility and threats by adult inmates ... and fears for her safety" and that "she has been sexually propositioned and harassed by older inmates." *Id.* at 15 (¶ 19). Although this allegation does not allege that she has been denied *treatment* which would lead to protection from these specific occurrences, *Youngberg* also recognizes a "constitutionally protected interest[ ] in conditions of reasonable care and safety...." *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462, 73 L.Ed.2d at 42–43, and her complaint need only state *any* set of allegations upon which the trial court could have granted relief. *Cram v. Howell*, 680 N.E.2d 1096, 1096 (Ind.1997). While we express no opinion as to the merits of the claim, her allegation that she has been subjected to hostility and threats by adult inmates and fears for her safety is sufficient to withstand a Trial Rule 12(B)(6) motion to dismiss for failure to state a claim.

## B. Lack of Subject–Matter Jurisdiction

■ Because we have found two claims which are sufficiently raised in Ratliff's complaint to withstand dismissal under Trial Rule 12(B)(6), we address the second ground on which the trial court's opaque order granting dismissal may have been based. The Commissioner requested dismissal, in

29. Ratliff's additional citations to *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 856 (7th Cir. 1990) and *Madrid v. Gomez*, 889 F.Supp. 1146 (N.D.Cal.1995), *mandamus denied sub nom., Wilson v. U.S. Dist. Court for the E. Dist. of Cal.*, 103 F.3d 828 (9th Cir.1996), *cert. denied, —— U.S. ——,* 117 S.Ct. 1823, 137 L.Ed.2d 1031 (1997), are not persuasive.

Ratliff cites *Murphy* as requiring "the responsible state officials to take steps to prevent children in state institutions from deteriorating physically or psychologically." *Murphy*, 914 F.2d at 851. This is not entirely accurate. *Murphy* involved the placement of foster children in sexually-abusive homes. The Seventh Circuit found, "*Youngberg v. Romeo* made clear ... that the Constitution requires the responsible state officials to take steps to prevent children in state institutions from deteriorating physically or psychologically." *Murphy*, 914 F.2d at 851. The Seventh Circuit did not grant a new liberty interests regarding a general right to treatment—as Ratliff contends—but, rather, the statement is inherently limited by *Youngberg* to situations where the physical or psychological deterioration is caused by the deprivation of the "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training [treatment] as may be required by these interests." *Young-*

*berg*, 457 U.S. at 324, 102 S.Ct. at 2462, 73 L.Ed.2d at 42–43 (emphasis added). This limitation is entirely consistent with *Murphy* itself, as the plaintiff's complaint focused on her placement in the care of foster homes and she claimed her deterioration was not the result of the state's failure to provide generalized treatment, but rather was the result of the state's failure to provide conditions of reasonable care and safety. *See Murphy*, 914 F.2d at 851 ("Ours is the ... case in which the state places the child in a private foster home or sequence of such homes and fails to take steps to prevent the child from deteriorating physically or psychologically as a result of either mistreatment by one or more sets of foster parents or the frequency with which the child is moved about within the foster-home system or, as in this case, both."). *See also Barichello v. McDonald*, 98 F.3d 948, 953 (7th Cir. 1996) (rejecting plaintiff's "liberty interest in rehabilitative treatment" because "*Youngberg* only held ... that mental patients had liberty interests in 'safety' and 'freedom from bodily restraint.'").

Ratliff also cites *Madrid* for the proposition that, "This duty to prevent deterioration has been extended to protect inmates with psychological problems in correctional settings." Brief of Appellant at 19. However, *Madrid* is not persuasive in this context because it involves an Eighth Amendment claim, not a Fourteenth Amendment claim.

part alleging lack of subject-matter jurisdiction under Trial Rule 12(B)(1).

In a memorandum in support of its motion to dismiss, the Commissioner argued, in a single sentence, that the trial court lacked jurisdiction to entertain the plaintiff's claims "because administrative decisions made by the Indiana Department of Correction are expressly exempt from judicial review. Indiana Code § 4–21.5–2–5(6)." Record at 23. This statute provides that the Administrative Orders and Procedures Act "does not apply to ... An agency action related to an offender within the jurisdiction of the department of correction." IND.CODE § 4–21.5–2–5(6) (1993). There is nothing in this statute to support the Commissioner's broad statement that courts lack the power of judicial review over alleged violations of an inmate's right to medical treatment under the Eighth Amendment and an inmate's constitutionally protected interests in conditions of reasonable care and safety under the Fourteenth Amendment. The grounds urged by the Commissioner in support of his challenge to the trial court's jurisdiction are insufficient to undermine the Marion Superior Court's general subject-matter jurisdiction. *See* IND. CODE § 33–5.1–2–1, 4 (1993).

We find no lack of subject-matter jurisdiction. The trial court's dismissal cannot be affirmed upon such a claim.

### C. Conclusion

Ratliff's complaint contending that her incarceration in adult prison violates Article 9 Section 2, Article 1, Section 15, Article 1, Section 16, Article 1, Section 18, and Article 1, Section 23 of the Indiana Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution fails to state a claim upon which a trial court could grant relief. Her complaint does state a claim upon which a trial court, after proper and sufficient proof at trial, could grant relief under the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment to the United States Constitution.

The trial court is affirmed in part and reversed in part. This cause is remanded for

further proceedings consistent with this opinion.

SHEPARD, C.J., and SULLIVAN, SELBY and BOEHM, JJ., concur.