KOKENES *v.* STATE OF INDIANA.

[No. 26,912. Filed March 10, 1938.]

*Oscar B. Thiel,* and *Leo J. Lamberson,* for appellant.

*Omer S. Jackson,* Attorney-General, and *Walter O. Lewis,* Deputy Attorney-General, for the State.

FANSLER, J.—The appellant was tried upon an affidavit in two counts, the first of which charged robbery, and the second the identical robbery while armed. There was a verdict of guilty upon both counts, and there was a judgment of guilty, and he was sentenced, upon both counts, the sentences to run concurrently.

Error is predicated upon the overruling of a motion to quash, and the overruling of a motion in arrest of judgment.

The first count of the affidavit charges robbery. The second charges robbery while the defendant was armed with a pistol, revolver, or gun, and that he was over sixteen years of age. Section 10-4709 Burns' Ann. St. 1933, §2409 Baldwin's 1934, provides that, if a person over the age of sixteen commits, or attempts to commit, certain crimes, including robbery, while armed with a pistol, revolver, rifle, shotgun, machine gun, or any other firearm, or any dangerous or deadly weapon, he "shall be guilty of a separate felony in addition to the crimes above named." The appellant sought, by motion to quash the second count, and by motion in arrest of judgment, to question the constitutionality of section 10-4709 Burns Ann. St. 1933, (§2409 Baldwin's) *supra,* upon the ground that it offends against the provision of article 1, §14, of the Constitution of Indiana, that: "No person shall be put in jeopardy twice for the same offense."

The statute is not unconstitutional. It merely defines

a crime, separate and distinct from the crimes of rape,
robbery, bank robbery, petit larceny, or grand
larceny, while unarmed. It does not follow, how-
ever, that a defendant may be convicted for com-
mitting a robbery and committing a robbery while
armed, where the same identical robbery is involved.
In *Jackson* v. *State* (1860), 14 Ind. 327, 328, it is said:
"The state cannot split up one crime and prosecute it in
parts. A prosecution for any part of a single crime, bars
any further prosecution based upon the whole or a part
of the same crime." In *State* v. *Elder* (1879), 65 Ind.
282, 285, the following rules are laid down by Biddle, J.,
who wrote the opinion:

"1. When the facts constitute but one offence, though
it may be susceptible of division into parts, as in lar-
ceny for stealing several articles of property at the
same time, belonging to the same person, a prosecution
to final judgment for stealing a part of the articles will
be a bar to a subsequent prosecution for stealing any
other part of the articles, stolen by the same act.

"2. When the facts constitute two or more offences,
wherein the lesser offence is necessarily involved in the
greater—as an assault is involved in an assault and bat-
tery, as an assault and battery is involved in an assault
and battery with intent to commit a felony, and as a
larceny is involved in a robbery—and when the facts
necessary to convict on a second prosecution would
necessarily have convicted on the first, then the first
prosecution  to a final judgment will be a bar to the
second.

"3. But when the same facts constitute two or more
offences, wherein the lesser offence is not necessarily in-
volved in the greater, and when the facts necessary to
convict on a second prosecution would not necessarily
have convicted on the first, then the first prosecution will
not be a bar to the second, although the offences were

both committed at the same time and by the same act."

The language quoted announces the unquestioned rule in cases where the offenses are of the same class, both felonies, as here, and where, as here, the lesser offense is included in the greater. An illustration is found in the case of homicide. There may be an indictment in three counts: murder in the first degree, murder in the second degree, and manslaughter. The same homicide is involved in all, but the offense is aggravated by malice, or malice and premeditation. A distinction should be noted in the case of separate indictments or separate counts charging the commission of a felony, and charging a conspiracy to commit the identical felony. It is apparent that conspiracy to commit a felony does not necessarily involve the commission of the felony. See *Durke* v. *State* (1932), 204 Ind. 370, 183 N. E. 97. The offenses here involved are in the same category. The same robbery is involved in both, but in one the offense is aggravated by the fact that the defendant was armed with a deadly weapon. If the robbery be established, but it is not proven that he was armed, there should be a conviction for robbery. If the robbery is established and that he was armed, there should be a conviction under the statute in question. Guilt under the latter necessarily implies that the defendant is guilty of the robbery. The judgment should have been for the greater offense. The court entered judgment and sentenced the defendant under both counts; the sentences to run concurrently, however. This was error, but perhaps harmless, since the sentences run concurrently.

The contention that the conviction on the first count bars a conviction on the second is untenable, since the convictions were simultaneous, and there was no *former* jeopardy.

Error is predicated upon the overruling of appel-

lant's motion to suppress certain confessions. This motion was made in writing, before the trial, and was overruled without evidence being heard upon it. When the confessions were offered in evidence, appellant objected to their admission upon the ground that they were made under the influence of fear, produced by force, threats, and intimidation. The court heard the evidence, in the absence of the jury, and admitted the confessions. Their admission was made one of the causes in the motion for a new trial, and is assigned as error.

It was not error to overrule appellant's motion to suppress. The appellant sought to follow the procedure for quashing a search warrant and suppressing the evidence procured thereunder, which is not an appropriate practice in the case of confessions. See *Brown* v. *State* (1880), 71 Ind. 470; *Ogle* v. *State* (1923), 193 Ind. 187, 127 N. E. 547; *Mack* v. *State* (1932), 203 Ind. 355, 180 N. E. 279, 83 A. L. R. 1349.

When the first of the confessions was offered in evidence, and objected to, the appellant asked leave to introduce evidence of violence and duress. Leave was granted, and, in the absence of the jury, the appellant testified, as a witness in his own behalf, that he resided in Chicago, where he had lived for about four years; that on November 25, 1936, the date on which the robbery was charged to have been committed, he was arrested by the Gary police and taken to the Gary police station; that, after he denied having participated in the crime, he was taken into a private room, ordered to undress, and, while undressing, was struck by some officer, who knocked out one of his teeth, and that he staggered against the wall; that seven or eight officers were present at the time, one of whom was addressed as "Captain"; that a heavy officer was the one who beat him; that the officers then asked him if he knew any-

thing about the robbery; that, when he denied it, he was called a —— liar and placed in a solitary cell; that, after dark, he was taken out of this cell, and, on repeating his denial of knowledge of the crime, was beaten, kicked, and struck with a blackjack on the top of his head; that the beating left scars on his head and face; that the police beat him with a rubber hose while he was stretched across a table; that he was taken to his cell and left there until morning, when he was beaten again. The record shows that the prisoner had scars on his face and head and a tooth missing at the time of the trial. The appellant further testified that a man, believed to be the mayor, came to his cell with the captain; that the man said: "What is the matter, Gus, have you got the toothache and I was going to explain to him that I got beat up and he didn't say anything, I just said my jaw is paining me"; that he was kept in solitary confinement for two days; that he was then taken to the Lake County jail at Crown Point, and, as soon as he was cleaned up, was taken upstairs, where eight or ten officers began asking him questions; that he was still in pain from the severe beating at the Gary jail, and continued to suffer for about three weeks; that a Gary policeman, Al Litchenfeldt, told appellant, before he was questioned, that they would come back after him at midnight and take him back to Gary, where they would get rid of him; that, not knowing what to do, in fear and in a weakened condition, he decided to sign anything they asked him to; that, in a room, in the Criminal Building, he recognized three deputy prosecuting attorneys, the chief deputy sheriff, and a stenographer; that this was the first occasion on which he had seen any of these persons. He testified that no one told him that his statements might be used against him, or advised him of his constitutional right not to give evidence against himself. Upon the other confession being offered (they

seem to have been made upon the same day), the appellant testified that he did not recall being taken into the prosecuting attorney's office; that he was pretty weak when brought to the county jail on November 27th, the date on which the statement was taken; that the prosecutor and two deputies were present, and that violence was not used on him there, but that he had just come from Gary, where violence had been used; that, as soon as he came into the prosecutor's office, every one began firing questions at him; that he was told he would be sent back to Gary unless he confessed; that the policeman, Al Litchenfeldt, was there, and threatened him, and that he was afraid of being beaten unless he signed a confession; that he was dazed at the time from the beating that had been administered to him, and did not remember what he said, or how he happened to say it; that Litchenfeldt "wanted to start some exercising"; that "he threatened to take me back to Gary and inject kerosene in me"; that he was afraid they would further mistreat him if he did not sign the confession; that the prosecuting attorney told him that "there isn't anything going to happen to you while you are here." He testified that, in the room where the confession was made, the officer Litchenfeldt asked the prosecutor "if he could do some exercising up here," and that the prosecutor replied that "we did not do that here." He said that Litchenfeldt was in the squad car which brought him to police headquarters; that he then told Litchenfeldt he did not know anything about the robbery; that Litchenfeldt said: "When I get through talking with you you will wish you wasn't lying." He said that he asked for a doctor while in the jail at Gary, and that no attention was paid to his request; that he saw a doctor while in the jail at Crown Point, and asked him for salve or something to rub on his wounds; that the doctor un-

buttoned his shirt, and that he showed him his bruises and told him about his tooth.

The doctor testified that he saw the defendant in the jail; that the defendant told him he had been beaten, and pulled up his shirt and showed him black and blue spots on his body; that the defendant told him that he had a tooth knocked out, but that he did not examine him. On cross-examination, he was asked whether the bruises could have been caused by a fall downstairs and striking some object in falling, and he answered that they could. On re-examination, he said that he did not think the bruises could have been made from blows from a fist, but that they could be caused by a rubber hose or a blackjack.

A witness, who was in the jail at Crown Point when the defendant was brought there, testified that the defendant asked him for liniment; that he took off his clothes, and that there were black and blue marks on his body, around his chest and back; that he had a bruise on the side of his face, and that his face was swollen as though he had been struck; and that he told him he got the injuries in the jail at Gary.

Another witness testified that he was in the jail at Gary when the defendant was brought in. He said that the appellant was upstairs, in the first cell, and that he was right back of him; that, shortly after appellant was first brought to his cell, he was taken to another part of the jail; that the next time he saw the appellant they were taking his picture; that, when they brought him back, after the first time he was taken out, "I heard some one say, trying to get him to talk, and it seemed like he would not say anything, I heard one officer say if you don't talk I'll knock your brains out."

Mr. Stultz, an investigator for the prosecuting attorney, testified that, at the time the appellant's statement was being taken in the prosecutor's office, "he

acted like he was scared but he wasn't threatened"; and that the prosecutor "told him that there would be nobody abuse him around there."

The testimony of the appellant, to the effect that he was threatened, assaulted, beaten, and tortured, and threatened with being returned to the Gary jail for further mistreatment if he did not make a confession, is undisputed. The police officers who had charge of the appellant in the Gary jail, including the captain, were not called, although they or some of them must have been available. In the light of the evidence, and lack of evidence, from police officers, the conclusion cannot reasonably be avoided that the appellant was violently and cruelly beaten for the purpose of coercing him into signing a confession, and that he was threatened with further abuse and mistreatment if he did not confess; and the conclusion cannot be avoided that he was claiming to be innocent and without knowledge of the crime; otherwise there would have been no incentive to mistreat him.

The evidence that went to the jury upon the merits of the case, in addition to the confessions, consisted of the testimony of James, who was charged to have been the victim of the robbery. He testified that he was working as manager of the Gary News Bureau, on the second floor of a building; that the entire second floor was occupied by the establishment; that there were seats for about thirty-five people; that there were forty or fifty people present in the place at the time of the robbery; that he heard a commotion, and, looking around, saw a man with two revolvers, who told them to turn their faces to the wall and put up their hands. He was required to open the safe, and saw three men at the time, all of whom had guns. He did not see the appellant on the night of the robbery. He said that he had been arrested for having gambling devices, and that he had not

been employed since the robbery; that he had other sources of income, but to disclose them would tend to incriminate him.

Lester Clapp, a Gary policeman, testified that he and his partner received a radio call; that they arrived at the place of the robbery in about two minutes, and saw between 125 and 150 people in the place, through a glass door; that four men were running into a corner of the room; that, when he and his partner got in, the men had gone out through a rear door; that they examined the room into which the four men had gone, and also the lavatory; that the janitor pointed out a man with two "45 automatics," who said he found the guns on the floor; that he then saw the appellant coming out of the stairway door, with both hands raised; that he placed him under arrest and took him to police station.

Peter Coleman, Clapp's partner, testified that when they went into the room they saw a bunch of people on the floor; that, in about ten or fifteen minutes, the janitor came up with a pair of guns; that they went over to the stairway leading down to the basement, and found the appellant, with his hands over his head, and that he said: "Please don't shoot." The appellant was then placed under arrest, and, when searched at police headquarters, $55 was found in his left shoe.

Charles P. McMahan, a Gary policeman, testified that he got a radio call to the scene of the robbery, and that he tried to get in the front door; that, upon being told it was locked, he ran through the garage to the rear of the building and into the alley, with two other officers; that they saw three men coming down a pole. The policemen killed the three men on the pole, and afterwards picked up four guns and some money. He saw a fourth man stick his head out of a window and then disappear into the building.

The defendant took the stand and testified as a wit-

ness. He testified that he had been a truck driver, for two years until eight or ten months before his arrest; that he had managed a sandwich shop in Waterloo, Iowa; that his last job was working for a bottling works; that he was married and had a daughter; that the place where he was arrested was a "gambling joint," where he had been three or four times before; that, on the evening of his arrest, he had $75 with him, part in his pocket and part in his left shoe; that his father had given him the money; that he had been betting on horse races when the hold-up occurred; that he still had $50 or $55 left; that he was behind the roulette wheel when some one shouted a "hold-up" or "stick-up"; that he lay on the floor with everybody; that there were approximately 200 or 300 people there; that he was on the main floor of the gambling house when arrested; that he did not take part in the hold-up or robbery. He repeated the story of the assaults upon him in police headquarters, and displayed scars on his lips and on the top of his head. He testified that his picture was taken in the Gary jail, showing whiskers on his face and a large swelling over his left eye. He said the picture was taken after he was beaten. He said that he was not given an opportunity to see a lawyer, although he had asked to be permitted to see one. He said that he had been arrested once before while transporting milk into Chicago while a strike was in progress, but had never been convicted of an offense; that, on the date of the robbery, he came to Gary in the afternoon, and parked his car in a parking lot; that his wife had a duplicate set of keys, and that she got the car; that, when the bandits went through the window, every one was told to go into the back room; that he often carried money in his shoes, having acquired the habit while driving a truck.

A witness named Palmer testified that he was in the

refrigerator business in Chicago, and that he knew the appellant, who had worked for him as a milk driver; that he was acquainted with his reputation for honesty and integrity, and that it was good.

The appellant's sister testified that he had never been in any trouble; that she was a cashier in a restaurant in Chicago; that she knew his reputation, and that it was good.

Appellant's wife testified that, at about the time they were married, appellant operated a gas station; that he had worked for a dairy, operated a truck, and managed a restaurant in Iowa; that, after returning from Iowa, he worked for a bottling concern in Chicago. She first heard of appellant's arrest from the newspapers. She came to Gary and was not permitted to see the appellant. She tried to see appellant with her lawyer, but was refused admission. She testified that, before appellant's arrest, he did not have a swollen jaw, and did not have scars on his lips and head, or any teeth out; that he left home about noon on November 25th, driving a Ford automobile, which was in the name of his brother, but which belonged to appellant. The next morning she heard of his arrest and immediately came to Gary. On leaving the police station she noticed their car in a parking lot. She had duplicate keys, and drove the car home. She testified that the defendant had never been arrested, although picked up by police two or three times. The appellant was recalled, and testified that he was picked up by the police in Evansville while on the way to the Kentucky Derby; that he was charged with vagrancy and discharged.

It will be noted that there is very little, if any, evidence, aside from the confessions, to connect the appellant with the crime; and that, although he took the witness stand and put his reputation in issue, there was no evidence of a previous criminal record or of a bad reputation. In the confessions he said that four fel-

lows, whose names he did not know, but whose first names were Pete, Jerry, Frank, and Johnnie, and himself, committed the crime; that he had been out with Johnnie the evening before and met the others and arranged the hold-up; that they let him out a block or half a block away from the place that was robbed, and that he went up there and sat in a chair until they came; that Pete started the hold-up; that he said it was a "stick-up," and ordered everybody to lie on the floor; that Pete, Jerry, and Frank got the money, and that appellant was standing by the lunch counter, and that he got about $55 from a man who was standing by the roulette wheel; that some one hollered "police," and that there was a commotion; that Johnnie was supposed to be waiting for them outside in a car; that they had come to Gary in Johnnie's car; that, when the commotion started, he opened the door and fell downstairs, where he stayed until arrested; that Jerry gave him the two automatics, and that they fell from his hands when he opened the door; that he had only known the three men who were killed two days; that this was his first "job"; that Johnnie knew he was broke and desperate; that he had three brothers and one sister, and that two of the brothers were out of work; that "I got in with a bad bunch"; that "I had about $55. I must have got it off of somebody there. I was sitting downstairs there and put it in my shoe"; that he did not say anything while the place was being held up; that he must have walked around with the two big black guns. It is notable that none of the many people in the place that was held up identified the appellant.

In admitting the confessions, the trial court must have considered that, because there was no force or coercion used at the time and place where appellant's statements were taken down, they were admissible. The statute, section 9-1607 Burns Ann. St. 1933, §2263 Baldwin's 1934, provides that: "The

confession of a defendant made under inducement, with all the circumstances, may be given in evidence against him, *except when made under the influence of fear produced by threats or by intimidation or undue influence;* but a confession made under inducement is not sufficient to warrant a conviction without corroborating evidence." (Italics supplied.) The Bill or Rights in the Constitution of Indiana provides: "No person, in any criminal prosecution, shall be compelled to testify against himself." Article 1, §14. Section 15 of article 1 provides: "No person arrested, or confined in jail, shall be treated with unnecessary rigor." The Constitution of the United States provides that no person "shall be compelled in any criminal case to be a witness against himself." Amendment 5. It cannot be doubted that physical torture and punishment, with threats of more to follow, may so intimidate and influence the will through fear as to compel false testimony to be given out of the presence of the inquisitors. It is true that there is evidence that the appellant was not beaten or threatened by the officers who took his two confessions. But it is not denied that he was threatened at the very portals of the room where he was examined, by a member of the Gary police force. It is true that he was told at the time of the examinations that he would not be abused *"here,"* but he was not assured that he would not afterwards be abused. It might be argued that, when the confessions were made, he was in the presence of representatives of the law—officers of the government, deputy sheriffs, and representatives of the office of the prosecuting attorney —and that he should have felt assured that he would receive protection from them against further indignities. But he had been cruelly mistreated by officers and representatives of the law, whose duty it was to maintain the peace and uphold the dignity of the State, and one of these police officers had followed him to the door of

the room where he was being questioned, with threats of torture and further abuse. It is argued that the confessions show on their face that they were made voluntarily. But the very fact that he was cruelly beaten and tortured to procure an admission of guilt, and it is not disputed that he was, is almost conclusive evidence that he had no desire to voluntarily admit complicity in the crime. It is a fundamental duty of all courts and all peace officers to uphold the law and protect the constitutional rights of citizens. Resort to torture and physical punishment—utter lawlessness—by sworn officers of the law is shocking and intolerable. When such occur, the constitutional rights of the injured person have been invaded, and, while the burden of showing the incompetency of a confession is upon the defendant, it must be concluded that, when he has shown that he has been tortured and brutally beaten for the purpose of intimidation and influencing him through fear to make a confession, he has sustained the burden; and, in the absence of a clear showing that the coercive force no longer operated when the confession was made, the confession should be excluded. It is said by a learned writer on the law of evidence: "But though promises or threats have been used, yet if it appears to the satisfaction of the judge that their *influence was totally done away* before the confession was made, the evidence will be received." But that, in the absence of circumstances showing a changed situation, "the influence of the motives proved to have been offered will be presumed to continue, and to have produced the confession, unless the contrary is shown by clear evidence; and the confession will therefore be rejected." Greenleaf on Evidence (15th Ed.) Vol. 1, §221, p. 300. "The rack and torture chamber may not be substituted for the witness stand. . . . And the trial . . . is a mere pretense where the state authorities have contrived a conviction rest-

ing solely upon confessions obtained by violence."
*Brown et al.* v. *Mississippi* (1936), 297 U. S. 278, 285,
286, 56 S. Ct. 461. The State does not expect, it expressly
forbids and condemns, such methods. It is better that
some criminals escape punishment than that the officers
of the law turn lawless in their zeal to procure evidence.
Once it is shown that lawless, inquisitorial means have
been used by the State's representatives for the purpose of
procuring a confession, the State is on the defensive, and
a confession following such coercive methods should be
rejected, unless and until it is made to appear that the
defendant has acknowledged the confession to be volun-
tary, under circumstances in which he is clearly free
from fear and coercion. This works no injury upon the
State, since it is contemplated that, when charged with
crime, a defendant may stand mute, even when put
upon his defense; and that he must be convicted upon
evidence other than that furnished by himself, unless he
freely and voluntarily elects to give evidence. It is noted
that, by the statute, a confession made under induce-
ment is not sufficient to warrant a conviction without
corroborating evidence; and, if it is unsafe to predicate
guilt upon a confession procured by promises of im-
munity, or partial immunity, or reward, it cannot be
doubted that confessions procured after physical vio-
lence, and torture, and a threat of further mistreatment,
are more unreliable.

The affidavit names Robert James as the person
robbed. When called as a witness, James testified that
his name is Richard C. James, but that he is
some times known as Robert James. Appellant
contends that this is a fatal variance, and that
the allegation of a robbery committed against the per-
son of Robert James is not supported by proof of a rob-
bery committed against the person of Richard C. James.
But if there is a variance, it is not such as might mis-

lead the defense, or expose the accused to the danger of being put twice in jeopardy, and therefore, under modern practice, it is not considered material. *Kruger* v. *State* (1893), 135 Ind. 573, 35 N. E. 1019; *Oats* v. *State* (1899), 153 Ind. 436, 55 N. E. 226; *Donnelly* v. *State* (1924), 194 Ind. 136, 142 N. E. 219.

Judgment reversed, with instructions to sustain appellant's motion for a new trial.

The clerk of this court will issue a proper order to the warden of the Indiana Reformatory for the return of the appellant to the sheriff of Lake County.