Richard MOORE, Defendant–Appellant,

v.

STATE of Indiana, Plaintiff–Appellee.

No. 06S00–0006–PD–389.

Supreme Court of Indiana.

June 26, 2002.

Lorinda Meier Youngcourt, Evans & Youngcourt, P.C., Janice L. Stevens, Marion County Public Defender Agency, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Thomas D. Perkins, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

DICKSON, Justice.

The defendant, Richard Moore, appeals his death sentence imposed following our remand for a new sentencing hearing. As a result of the November 1979 deaths of Rhonda Moore, John Caldwell, and Gerald F. Griffin, the State charged the defendant with three counts of murder and six additional counts charging other offenses. Alleging that Griffin was an Indianapolis police officer acting in the course of his duty and that the defendant committed two other murders, the State sought the death penalty. After obtaining a change of venue, the defendant pleaded guilty to the three counts of murder. The State then dismissed the six counts charging other offenses. Following a sentencing hearing in 1980, the trial court sentenced the defendant to death. This Court affirmed the defendant's conviction and sentence on direct appeal. *Moore v. State*, 479 N.E.2d 1264 (Ind.1985). The defendant's petition for post-conviction relief was granted in 1995, but the State appealed and this Court reversed the post-conviction court, reinstated the guilty pleas, and remanded for a new sentencing proceeding. *State v. Moore*, 678 N.E.2d 1258 (Ind.1997).

Following a new sentencing hearing before a new judge, the defendant was once again sentenced to death. In the present appeal, he challenges this death sentence asserting (1) that he was deprived of his right to a jury; (2) that the evidence was insufficient to prove that he knowingly shot a police officer; (3) that the trial court improperly weighed the mitigating evidence; (4) that the length he has been on death row violates both the federal and state constitutions; (5) that execution by lethal injection is unconstitutional; and (6) that the trial court erred when it excluded certain expert testimony.

## 1. Right to Jury

■ The defendant first contends that the Indiana capital sentencing statute violated the federal and state constitutions by depriving him of a jury determination of the aggravating circumstances that made him eligible for the death sentence.

Because of the historical facts of these proceedings, we do not reach this argument. Even if we were to assume that the defendant might otherwise be constitutionally entitled to a jury determination of the death eligibility factors, his plea of guilty forfeited any such claimed entitlement. When the defendant pleaded guilty to three counts of murder, he did so knowing that such plea would deprive him of access to a jury. In the defendant's direct appeal this Court recited the facts supporting his voluntary pleas:

> The trial court thereupon conducted a hearing to determine the voluntariness of Appellant's guilty pleas. The trial court examined Appellant about his mental status and about his knowledge of the many constitutional rights he was waiving by pleading guilty. The trial court specifically informed Appellant of the minimum and maximum penalties he faced by pleading guilty as charged and reminded Appellant that the State was seeking a death penalty for him. *The trial court also carefully advised Appellant that by pleading guilty he would waive his right to have a jury recommend to the trial court whether or not a death penalty should be imposed against Appellant.* Appellant consistently stated, without equivocation, that he understood everything that the trial court was discussing with him and that he knew what he was doing. Appellant

also stated his belief that he had been adequately and satisfactorily represented by his counsel and that he had not been forced, threatened or induced in any way to enter his guilty pleas. We note that there was no plea agreement in this case. A factual basis for Appellant's three guilty pleas was presented to the trial court by the State and Appellant confessed three different times to having committed the three murders charged in Counts I, II, and III. Having carefully and comprehensively examined Appellant, the trial court accepted Appellant's guilty pleas and found Appellant guilty of the three murder counts.

*Moore v. State,* 479 N.E.2d 1264, 1268 (Ind.1985) (emphasis added).[1]

We discern that the defendant's argument also asserts, in part, that the Indiana death penalty statute fails to ensure that his death eligibility factors are determined beyond a reasonable doubt. At the time of the offense, the statute, Indiana Code § 35–50–2–9 (Supp.1979), provided in relevant part, "If the defendant was convicted of murder in a jury trial, the jury shall reconvene for the sentencing hearing; if the trial was to the court, or *the judgment was entered on a guilty plea, the court alone shall conduct the sentencing hearing.*" Ind.Code § 35–50–2–9(d) (Supp. 1979) (emphasis added). The statute also required that, before a death sentence may be imposed in a proceeding before the court without a jury recommendation, the court must find that the State has proved beyond a reasonable doubt that at least one of the statutory aggravating circumstances exists. Ind.Code § 35–50–2–9(g)(1) (Supp.1979). In this case, at the conclusion of the new sentencing proceed-

---

1. The defendant has requested the opportunity to supplement his brief to further address the application of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) to an Indiana death sentence. Because this issue is not determinative here, we deny his motion to supplement his brief.

ings following remand, the trial court explicitly found that the State had proven each aggravating circumstance beyond a reasonable doubt. Record at 678–79.

### 2. Sufficiency of Evidence Supporting Aggravating Circumstance

■ The defendant next contends that the trial court's finding of the aggravating circumstance of shooting a law enforcement officer in the line of duty lacks sufficient evidentiary support.

■ The trial court on resentencing found as an aggravating circumstance that a victim of the murder was a law enforcement officer acting in the course of duty to be proven beyond a reasonable doubt. Indiana Code § 35–50–2–9(b)(6) (Supp. 1979) reads, "The victim of the murder was a corrections employee, fireman, judge, or law-enforcement officer, and either (i) the victim was acting in the course of duty or (ii) the murder was motivated by an act the victim performed while acting in the course of duty." In order for this aggravating circumstance to be found, the fact finder must find beyond a reasonable doubt that the defendant knew the victim was a law enforcement officer. *Castor v. State*, 587 N.E.2d 1281, 1290 (Ind. 1992). In regard to this aggravating circumstance, the trial court concluded, "[T]he State has proven beyond a reasonable doubt that the Defendant intentionally shot and killed a law enforcement officer acting in the course of his duty and that he knew that the victim was a law enforcement officer." Record at 678.

■ When determining whether the evidence supports an aggravating circumstance, we apply the same standard applicable when determining the sufficiency of evidence to convict. *Fleenor v. State*, 622 N.E.2d 140, 151 (Ind.1993). In addressing a claim of insufficient evidence, an appellate court must consider only the probative evidence and reasonable inferences supporting the judgment, without weighing evidence or assessing witness credibility, and determine therefrom whether a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Marcum v. State*, 725 ·N.E.2d 852, 863 (Ind.2000).

As to the challenged aggravating circumstance, the trial court found:

1. Richard Moore entered a plea of guilty to Count III, Murder, of the Charging Information that he knowingly killed Gerald F. Griffin on November 6, 1979.

2. It is undisputed that the victim was a law enforcement officer acting in the course of duty.

3. Pursuant to *Cas[tor] v. State*, 587 N.E.2d 1281, the question for the Court and burden of the State is whether the Defendant *KNEW* (not should have known) that Gerald Griffin was a police officer.

4. The Defendant called as an expect [sic] witness John Stephen Sobeck, a senior resident analyst for Wolf Technical Services. He was recognized as an expert in lighting and effects on human vision.

5. Sobeck testified that he had reviewed the following for the purpose of developing his opinions:

depositions of Officer Atwood, Pam Myers, Don Whitman, Doyle Glass, Susan Wright, Pat Young, Patterson, Ruth Caldwell, witness statement of Ray Potter, autopsy report of Griffin, photos by police at scene, drawing of scene, lights at location, climatological data, *trial examination of Atwood* (emphasis added [in original]), and Richard Moore's testimony at sentencing hearing.

6. Sobeck testified that he examined the characteristics of the scene including

location of home to city street lights, general layout of home, kitchen, carport, living room, windows, location of lights in carport, kitchen and living room, condition of doors, screens in carport area and clothing of Officer Griffin.

7. Sobeck testified that exhibit "F" was very important to his opinion in that the small fluorescent light in the kitchen was apparently the only light that was on.

8. Sobeck testified that he assumed that Officer Griffin was about 10 feet from the muzzle end of Defendant's shotgun.

9. Sobeck testified that he assumed that storm/screen door was also closed.

10. Sobeck testified that it was his opinion, assuming Defendant 10 feet plus length of shotgun away from Griffin—Griffin behind both the kitchen and the storm/screen door—and the only illumination coming from the small fluorescent light above the sink, that Defendant would not have been able to discern the clothing of Griffin other than dark clothing, that he might be able to tell it was a white person, and possibly the appearance of a gun but little more.

11. Sobeck admitted that if the carport light [were] on it would significantly alter his opinion of what the Defendant could see.

12. Ruth Caldwell testified that it was her husband's routine and habit to turn on the carport light when anyone came to the house.

13. She further testified that her daughter Rhonda had gone out to the carport area to talk with the Defendant and that she (Ruth Caldwell) had gone to the bedroom window looking out watching them.

14. She testified that she could see them clearly and that when she saw Rhonda begin crying she went to tell her husband that Rhonda should come in.

15. Officer Amos Atwell testified that he saw Officer Griffin approach the house and knock on the left side (white part) of the door and that the carport light was on.

16. Atwood further testified that he saw Griffin crouch down pulling his gun up saying "hey man—don't do it", prior to being shot in the chest.

17. Officer Roy Potter testified that a yellow tinted light was on.

18. Detective Louis Christ testified that the inside garage light on the west side of the residence was on.

19. Although her recollection was questioned, Susan Glass Wright Harmon who was a neighbor of the Caldwells on November 6, 1979, said she believes the yellow light was on.

20. Defendant's Exhibit "Y" shows that radio communications described "requesting medic, officer shot" (likely Griffin) at 19:48:42 (7:48 and 42 seconds p.m.)

21. Defendant's counsel argues that the Defendant's ability to see and perceive was hampered by the fact that he was blind in one eye and that due to lighting conditions his ability to recognize Griffin as a law enforcement officer was impaired.

22. This Court as the fact finder has used its common sense and everyday life's experiences to evaluate the facts of this case.

23. This Court finds that Sobec[k]'s opinions are flawed because the assumptions which form the basis of his opinions are not supported by the facts.

24. Sobeck's assumption that Officer Griffin was standing behind both the kitchen door and the storm/screen door is very unlikely because of the following:

a. Officer Amos Atwood could not have seen Officer Griffin knock on the left side of the door (on the white part) if the storm/screen door had been closed.

b. Pictures of the storm/screen door show absolutely no gun shot holes through the screen portion. Sobeck states that there was a narrow portion of the glass portion of the kitchen door that coincides with a glass portion of the storm/screen door that if the Defendant's shotgun blast was perfect it could have gone through that area and hit Griffin in the chest. Although theoretically possible, this Court finds it unlikely.

25. Sobeck's opinion that the small fluorescent light over the sink was the only illumination going out into the carport patio area is just not supported by the facts.

26. It would have been impossible for Ruth Caldwell to observe the Defendant and Rhonda out on the carport area clearly if the only illumination was coming from the small fluorescent light over the sink.

27. Ruth Caldwell would not have been able to see Rhonda's eyes tear up unless the yellow light on the carport was lit.

28. Officers Atwood, Potter and Christ all testified that the carport light was on.

29. Counsel's argument that Defendant's ability to see and perceive was hampered due to being blind in one eye is weakened by the fact that within a three (3) minute period of time the Defendant shot at least three (3) police officers. Griffin, and then approximately three (3) minutes later his eyesight and firearm skill was such that in rapid fire succession he hit one officer directly in his face (Mukes), who was in police uniform, stepping out of a fully marked police car underneath a street light, approximately 30 to 35 yards away, and another officer (Potter) on the run, knocking his legs out from under him.

30. In examining all the above facts this Court is convinced that the Defendant's expert witness on lighting and its effects on human vision is flawed and carries much less weight than the Defendant would desire.

31. This Court is firmly convinced that not only was the small fluorescent light in the kitchen on, but the yellow light in the carport directly to the left of the kitchen door was on, and that Officer Griffin as located between the kitchen and the storm/screen door.

32. This Court is firmly convinced that the Defendant was able to clearly see that Griffin was a uniformed officer with badge on his upper left chest/shoulder area, directly under the light in the carport next to the kitchen door.

33. This Court is firmly convinced that the Defendant knew when he shot Griffin that he was shooting a police officer.

34. For all the above reasons, this Court finds that the State has proven beyond a reasonable doubt that the Defendant intentionally shot and killed a law enforcement officer acting in the course of his duty and that he knew that the victim was a law enforcement officer.

3[5]. The State has proven beyond a reasonable doubt said aggravating circumstance, as required by law.

Record at 671–78.

The defendant argues that these findings are flawed in various respects. First, the defendant argues that the finding that Officer Griffin was between the storm door and kitchen door when he was shot is unsupported by the evidence. However, Officer Atwood testified that Officer Griffin knocked on the white kitchen door,

which requires the storm door to be open. Record at 1144–45. Also, contrary to the defendant's view, the court reasonably inferred that the storm door was open from the fact that the top screen portion of the storm door was intact (*i.e.*, was not affected by the shotgun blast). Next, the defendant suggests that this Court should judge anew the credibility of the witnesses and reweigh the other evidence regarding whether the light in the carport was on at the time of the shooting. We decline.

There is probative evidence in the record from which the fact-finder could have found beyond a reasonable doubt that the defendant "knew that the victim was a law enforcement officer." Record at 678.

### 3. Mitigating Evidence

■ The defendant contends that the trial court improperly weighed the mitigating circumstances. Pointing to certain trial court comments at sentencing and in its order denying the motion to correct errors that suggested some of the proposed mitigators would be more appropriately considered in a clemency request, the defendant argues, "[t]he sentencing court, in effect, limited the weight to be given to the mitigating factors, because a later body, charged with a wholly different mission, was likely to correct any error that it might have made." Br. of Appellant at 45. Indiana Code § 35–38–1–3(3) requires that if the trial court finds aggravating or mitigating circumstances, its record must include "a statement of the court's reasons for selecting the sentence that it imposes." *Id.* As we have previously stated:

> The requirement for sentencing findings are more stringent in capital cases than in non-capital sentencing situations. The trial court's statement of reasons (i) must identify each mitigating and aggravating circumstance found, (ii) must include the specific facts and reasons which lead the court to find the exis-

tence of each such circumstance, (iii) must articulate that the mitigating and aggravating circumstances have been evaluated and balanced in determination of the sentence, and (iv) must set forth the trial court's personal conclusion that the sentence is appropriate punishment for this offender and this crime.

*Harrison v. State,* 644 N.E.2d 1243, 1262 (Ind.1995) (citations omitted). The defendant does not contend that the trial court failed in this regard, but, citing *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), he asserts that the trial court denied him a fair determination of the appropriateness of a death sentence by delegating the responsibility to consider mitigation evidence to the clemency board.

In the trial court's written findings it stated, "The Court has weighed and considered all the mitigating factors proffered by the Defendant. The Court believes that the majority of those mitigating factors are more properly suited to consideration for clemency." Record at 691. And in its order ruling on the defendant's motion to correct error stated, "This Court though still believes that the Defendant's exemplary conduct over the twenty (20) years that he has been in prison, although the Court has considered and given appropriate weight to the same, the Court still believes is more appropriately a consideration of clemency. This belief is *dicta,* and in no way, shape or form did this Court not give careful consideration to *all* mitigators presented by the Defendant." Record at 1050–51 (emphasis in original).

Given the trial court's express and detailed findings, we are not persuaded that the trial court diminished its own sense of responsibility for the determination of the appropriateness of a death sentence by relying on a future clemency review to remedy an error in the weight given to the mitigating circumstances.

#### 4. Time Spent on Death Row

■ The defendant maintains that his twenty years spent under a sentence of death constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution.[2] This claim has become known as a *Lackey* claim from Justice Stevens's suggestion in *Lackey v. Texas*, 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995) (memorandum respecting denial of certiorari), that such a claim is important and would benefit from the attention of lower and state courts to test the viability of such a claim. Justice Thomas has concluded that after the resounding rejection by courts of *Lackey* claims that the Supreme Court "should consider the experiment concluded." *Knight v. Florida*, 528 U.S. 990, 993, 120 S.Ct. 459, 461, 145 L.Ed.2d 370, 372 (1999) (Thomas, J., concurring in denial of certiorari); *see, e.g., Chambers v. Bowersox*, 157 F.3d 560, 570 (8th Cir.1998); *Ex parte Bush*, 695 So.2d 138, 140 (Ala.1997); *State v. Schackart*, 190 Ariz. 238, 947 P.2d 315, 336 (1997); *People v. Massie*, 19 Cal.4th 550, 79 Cal.Rptr.2d 816, 967 P.2d 29, 44–45 (1998); *Booker v. State*, 773 So.2d 1079, 1096 (Fla.2000); *People v. Simms*, 192 Ill.2d 348, 249 Ill.Dec. 654, 736 N.E.2d 1092, 1141 (2000); *State v. Smith*, 280 Mont. 158, 931 P.2d 1272, 1287–88 (1996); *State v. Moore*, 256 Neb. 553, 591 N.W.2d 86, 93–95 (1999); *Bell v. State*, 938 S.W.2d 35, 53 (Tex.Crim.App.1996).

We find the reasoning in the cases rejecting *Lackey* claims to be persuasive. The Nebraska Supreme Court has described the nature of a typical *Lackey* claim:

[The defendant] has not claimed that the State has set up a scheme to prolong the period of his incarceration or purposely resentenced [the defendant] in order to torment him. The delay in carrying out the sentence of death has been caused by the fact that [the defendant] has availed himself of procedures our law provides to ensure that executions are carried out only in appropriate circumstances. That this differs from the practice at common law, where executions could be carried out on the dawn following the pronouncement of the sentence, is a consequence of our evolving standards of decency, which prompt us to provide death row inmates with ample opportunities to contest their convictions and sentences.

*Moore*, 591 N.W.2d at 94. We also agree that:

"A defendant must not be penalized for pursuing his constitutional rights, but he also should not be able to benefit from the ultimately unsuccessful pursuit of those rights. It would indeed be a mockery of justice if the delay incurred during the prosecution of claims that fail on the merits could itself accrue into a substantive claim to the very relief that had been sought and properly denied in the first place. If that were the law, death-row inmates would be able to avoid their sentences simply by delaying proceedings beyond some threshold amount of time, while other death-row inmates—less successful in their attempts to delay—would be forced to face their sentences. Such differential treatment would be far more 'arbitrary and unfair' and 'cruel and unusual' than the current system of fulfilling sentences

---

2. We note that during eight years of this time the defendant was pursuing a petition for post-conviction relief. The reason for this inordinate length of time is largely due to continuances requested by the defendant.

The post-conviction hearing was scheduled four times during the proceedings. Three of those dates were vacated on the defendant's motions.

when the last in the line of appeals fails on the merits."

*McKenzie v. Day,* 57 F.3d 1493, 1494 (9th Cir.1995) (quoting *Richmond v. Lewis,* 948 F.2d 1473, 1492 (9th Cir.1990), *rev'd on other grounds,* 506 U.S. 40, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992), *vacated,* 986 F.2d 1583 (9th Cir.1993)). We also note that recognizing a *Lackey* claim would "dramatically alter the calculus in granting stays of execution in death penalty cases." *Moore,* 591 N.W.2d at 94. "The philosophy of erring on the side of caution would lose much of its vitality in a regime where the state risks being pushed permanently out of bounds if the execution is too long deferred by the process of adjudication." *Id.* To ensure the just administration of the death penalty the value of speed should not trump the value of accuracy.

We decline the defendant's claimed violation of his rights under the Eighth Amendment to the United States Constitution.

■ The defendant also claims the delay in his execution violates Article 1, § 15 of the Indiana Constitution barring unnecessary rigor in the treatment of prisoners. The defendant argues that the emotional abuse suffered in awaiting execution is consistent with violations of Article 1, § 15 that Indiana courts have recognized in the past. The defendant cites three cases: *Kokenes v. State,* 213 Ind. 476, 13 N.E.2d 524 (1938); *Bonahoon v. State,* 203 Ind. 51, 178 N.E. 570 (1931); *Roberts v. State,* 159 Ind.App. 456, 307 N.E.2d 501 (1974). All three cases involved physical abuse of a prisoner. *See, e.g., Kokenes,* 213 Ind. at 481–82, 13 N.E.2d at 526–27 (tooth knocked out, beaten with fists, kicked,

struck with blackjack and rubber hose); *see also Ratliff v. Cohn,* 693 N.E.2d 530, 541 (Ind.1998) (noting past Art. 1, § 15 cases have involved physical abuse and refusing to extend to prisoner's alleged lack of proper rehabilitative treatment). Besides the assertion that the defendant's emotional stress outweighs the physical abuse in these cases, the defendant offers no argument or authority why Article 1, § 15 should be extended beyond physical abuse to emotional stress. We conclude that the length of time a person has spent on death row does not render his execution unconstitutional under the federal or state constitution.

### 5. Death by Lethal Injection

■ The defendant argues that death by lethal injection as it is performed in Indiana is a violation of the Eighth Amendment to the United States Constitution.[3] The Eighth Amendment does not prohibit the death penalty but requires it to be performed in a manner that avoids unnecessary or wanton infliction of pain. *Louisiana v. Resweber,* 329 U.S. 459, 463, 67 S.Ct. 374, 376, 91 L.Ed. 422, 426 (1946). "Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies something inhuman and barbarous, something more than mere extinguishment of life." *In re Kemmler,* 136 U.S. 436, 447, 10 S.Ct. 930, 933, 34 L.Ed. 519, 524 (1890). The definition of cruel and unusual punishment also contains an element of comporting with current societal norms. *See Trop v. Dulles,* 356 U.S. 86, 100–01, 78 S.Ct. 590, 598, 2

---

3. The defendant also claims the lethal injection procedure is especially cruel and unusual as applied to him because of his obesity. In his argument the defendant only raises possible difficulties without substantiation of their probability. The defendant fails to demonstrate how this procedure will be uniquely onerous to him because of his particular characteristics.

L.Ed.2d 630, 642 (1958) (plurality opinion). While the Eighth Amendment does set the outer limits, the proper mode of execution is more a question of public policy to be argued to the legislature. *See Miller v. State,* 623 N.E.2d 403, 411 (Ind.1993). We conclude that death by lethal injection does not involve unnecessary and wanton infliction of pain or conflict with societal norms.[4]

### 6. Expert Testimony

 Lastly, the defendant argues that the trial court erred when it excluded expert testimony proffered by the defendant regarding his awareness at the time of the crime. During the sentencing hearing, Dr. Frank Ochberg, a psychiatrist, testified concerning his evaluation of the defendant's mental and emotional states before and during the crime. When the defendant attempted to elicit Dr. Ochberg's opinion as to the defendant's awareness that he was shooting a police officer, the State objected on the grounds that this was impermissible opinion testimony.[5] The court sustained the State's objection, and the defendant proceeded with the following testimony of Dr. Ochberg as an offer of proof:

> My opinion is that Mr. Moore was surprised that it turned out to be a police officer. He told me, I didn't believe a police officer would be there. I can't believe that a police officer was there. So he expressed, almost I would say, indignation that a police officer would be there at that time. My opinion was that Mr. Moore was not aware that he was shooting a police officer, but he was aware that he was shooting at somebody who was behind a gun.

Record at 2090.

Indiana Rule of Evidence 704(b) states in part, "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case." Dr. Ochberg's opinion as to what the defendant was thinking at the moment he shot Officer Griffin would have directly reflected on the defendant's intent, guilt, or innocence, and thus was an inadmissible conclusion regarding intent. *See Jackson v. State,* 728 N.E.2d 147, 153 (Ind.2000) (stating testimony that the shooting was accidental was inadmissible as an expression of opinion as to intent, which is barred by Rule 704(b)); *Griffin v. State,* 692 N.E.2d 468, 472 (Ind.Ct.App.1998), *summarily aff'd. on this issue,* 717 N.E.2d 73 (Ind.1999). A trial court has discretionary power regarding the admission of evidence, and its decisions are reviewed only for an abuse of that discretion. *Rubalcada v. State,* 731 N.E.2d 1015, 1023 (Ind.2000). The trial court did not abuse its discretion when it excluded this opinion testimony.

### Conclusion

The defendant's sentence of death is affirmed.

SHEPARD, C.J., and SULLIVAN, BOEHM, and RUCKER, JJ., concur.

---

4. We are not alone in our conclusion that death by lethal injection does not violate the Eighth Amendment to the United States Constitution. *See, e.g., State v. Hinchey,* 181 Ariz. 307, 890 P.2d 602, 610 (1995); *State v. Deputy,* 644 A.2d 411, 421–22 (Del.1994); *State v. Moen,* 309 Or. 45, 786 P.2d 111, 143 (1990). In addition, 37 states have lethal injection as their preferred mode of execution, as does the federal government.

5. In the State's objection, it cites to Ind.Evidence Rule 705. Record at 2089. From the content of the objection and the response of the defendant, it is clear that the objection and ruling were based on Ind.Evidence Rule 704. Record at 2089–90.