## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 20 2016, 6:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

John M. Smith,
*Appellant-Defendant*,

v.

State of Indiana,
*Appellee-Plaintiff*.

December 20, 2016

Court of Appeals Case No.
15A04-1601-CR-148

Appeal from the Dearborn
Superior Court

The Honorable Sally McLaughlin,
Judge

Trial Court Cause No.
15D02-1402-FA-6

**Brown, Judge.**

John M. Smith appeals his conviction and sentence for conspiracy to deal heroin as a class A felony. Smith raises two issues which we revise and restate as:

> I. Whether the court abused its discretion in admitting evidence of a search; and
>
> II. Whether Smith's sentence is inappropriate in light of the nature of the offense and his character.

We affirm.

## Facts and Procedural History

On June 22, 2012, Indiana State Police Trooper James Wells was parked on a median cross-over on I-74 when, just before 11:00 a.m., he observed a car tailgating a minivan traveling east on I-74. As the car passed, Trooper Wells observed that the posture of the driver, later identified as Destanee Gaines, looked "a little unusual" as she was leaning forward off the seat with her mouth locked open and her eyes wide open "like she was kind of in a state of panic." Transcript at 141. Trooper Wells then initiated a stop for the traffic violation.

Trooper Wells approached the passenger side door, greeted Gaines, and asked for her license. He observed that Gaines was "very, very nervous," that she was breathing heavily, and that her hands were shaking uncontrollably when she handed him her license. *Id.* at 142. He asked her who owned the car, and she said that it was a rental. Gaines handed him the rental agreement and had a "blank look on her face like she was in shock and said it's right there at the

bottom." *Id.* at 143. Trooper Wells asked what was the name on the agreement, and Gaines said John Smith.

[4] He then asked Gaines to come back to his vehicle with him while he checked her license and registration, and Gaines sat in the front seat of his vehicle. He asked her about her trip, and she said she was coming from Chicago and was on her way home to Cincinnati. He asked her when she went to Chicago, and she started to say "we went up there," but then stopped midsentence and said, "I went up there last week," which was unusual. *Id.* at 144. He noticed that Gaines was struggling for answers to very simple questions and changing them midsentence and her nervousness was "just getting worse and worse." *Id.* at 145. In addition to her heavy breathing and shaking hands, Trooper Wells, who had received training on the "adrenalin dump" and the physical changes it causes, as well as observing nervousness, could see "her heart beating in her carotid." *Id.* at 145, 183.

[5] He asked her why she was so nervous, and she said that she was terrified of the highway. He did not believe her and asked her if she was traveling with anything illegal, to which she responded: "No sir." Defendant's Exhibit B1 at 6:15-6:20. He asked if she had any drugs with her, and Gaines answered that she probably had a joint in her purse. Trooper Wells said: "[Y]ou know, this nervousness seems like more than that, is there anything else in the car[?]" Transcript at 189. Gaines looked away from him, stared at the car, and just shook her head. He then placed her in handcuffs and searched the car.

[6] Trooper Wells first checked the trunk and noticed that there was no luggage or overnight bags or anything consistent with traveling for a week. He then found Gaines's purse and a small bag containing marijuana in the side pocket of a wallet on the passenger side of the seat. He continued searching the car and eventually observed that the mounting hardware, the screws, and the bolts in the door that hold the plastic shell to the metal shell were all missing paint, indicating they had been "tooled up." Transcript at 150. He rolled the window down, but the window stopped about an inch or two before going all the way down because it hit something. His training indicated that there was something at the bottom of the door preventing the window from going all the way down. He then spread the weather stripping open, shined his light into the door, and observed a package wrapped in green plastic and another package wrapped in a t-shirt.

[7] Trooper Wells then went to talk to Gaines about the contraband in the door, and she denied knowledge of it. He eventually took the door apart and retrieved three packages containing approximately three kilograms of heroin.

[8] Trooper Wells transported Gaines to the police department, and she eventually agreed to cooperate and call Aldon Webb. Gaines told Webb she was stopped by the police and arrested for possession of marijuana and her vehicle was impounded, that the rental company was going to retrieve it later the same evening, and she requested that Webb come and recover her personal belongings from the rental car.

[9] Numerous officers went to the towing business, and Detective Tim Wuestefeld posed as a tow truck driver. Webb later arrived at the towing business and spoke with Detective Wuestefeld, who told Webb that he could have access to the vehicle to retrieve Gaines's personal belongings. Other officers apprehended Webb, and Webb admitted that he was there to retrieve the heroin, that his supplier was Smith, and that Smith advised him to obtain certain tools to release the screw on the door.

[10] On February 6, 2014, the State charged Smith with conspiracy to commit dealing in heroin as a class A felony. On October 19, 2015, Smith filed a motion to dismiss and to suppress evidence. In his memorandum in support of his motion, he argued that the evidence was obtained improperly under the United States Constitution.

[11] After some discussion concerning the motion at the beginning of the trial on October 21, 2015, the court said the State would proceed with calling the first witness and that, if the court made the decision to suppress the evidence, then the case would be dismissed.

[12] Trooper Wells testified that he attended the Law Enforcement Academy in 2001, was assigned to the Versailles Post from 2001 to 2012, and received extensive training in criminal interdiction, human trafficking, and smuggling, had been doing interdiction enforcement since 2008, was assigned as a DEA task force officer, and had made 15,000 traffic stops since 2008. He testified that he received training in concealment methods and in noticing things that are

inconsistent with the normal innocent motoring public, and that Gaines's level of nervousness was much higher than someone who would be pulled over for speeding. He also testified that rental cars are usually brand new and that it is rare to see any type of mechanical defect on a rental car. On cross-examination, Trooper Wells testified that when someone gives up a small amount of marijuana, it is for a reason, and that they call it a "drop dope," which means "give up a small amount, go to jail for a misdemeanor and keep something bigger hidden." *Id.* at 193.

[13] After the presentation of evidence, Smith's counsel presented argument regarding the motion to suppress and asked that the stop and resulting evidence be suppressed. The court found there was probable cause for the stop and noted Trooper Wells's training and observations about Gaines, and the car and her statement about marijuana, and concluded that Trooper Wells had probable cause to search the car. The court also found that the evidence need not be suppressed under the Indiana Constitution.

[14] Smith's counsel then moved for dismissal or acquittal and argued that there was no evidence of a conspiracy, and the court denied the motion. The jury found Smith guilty as charged.

[15] At the sentencing hearing, the court admitted the Government's Sentencing Memorandum from a federal case in the United States District Court for the Northern District of Illinois, in which the government alleged that Smith sold heroin to a confidential source on four occasions for a total of 193 grams of

heroin in 2010 in exchange for $16,125. The government also referred to the arrest in the present case and evidence of narcotics trafficking subsequent to the offenses in the federal case. Smith spoke at the hearing and mentioned his family and taking youths off the street and signing them as artists to his record label. Smith also stated that he was not going to say that what he did was right but that he was not involved in dealing anymore and that "[i]t's not the drug that's killing; it's the cut that the street cutters put on this drug and here it is a street dealer he's seven (7) years but he's asking the Court to give me fifty (50)."[1] *Id.* at 533.

[16] The court observed that Smith was serving a sentence of 216 months on a conviction in the United States District Court for the Northern District of Illinois for four counts of distributing heroin for offenses prior to November 23, 2010. It noted that Smith was not without resources to earn an income legally and that he actively participated in the sale of drugs solely for profit. The court also stated that Smith's comments that it is the street dealer who is killing the individuals using heroin illustrates his character, and that, if not intercepted by police, he would have distributed three kilograms of pure heroin for profit to be cut and distributed by street dealers. The court found Smith's character was such that long term incarceration was appropriate to protect community safety. The court found the excessive amount of heroin, Smith's criminal history, and

---

[1] Webb testified that he received a sentence of twenty years with five years suspended and that if he had good time credit he would serve seven and one-half years.

his inability to respond affirmatively to prior rehabilitative programs, probation, or incarceration to be aggravating factors, and that these aggravating factors far outweighed any mitigating circumstances including the effect incarceration would have on his children. The court found that "although the instant case may have been utilized as an argument by the Prosecutor in Federal Court to show significant ongoing escalating drug trafficking and may have impacted [the] length of sentence in Federal Court; the instant offense occurred after and was separate from the counts leading to the Federal conviction and were not charged in Federal Court." *Id.* at 544. The court sentenced Smith to fifty years to be served consecutive to the federal sentence.

## *Discussion*

### I.

[17] The first issue is whether the court abused its discretion in admitting evidence of the search. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001). Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*. "[T]he ultimate determination of the constitutionality of a search or seizure is a question of law that we consider de novo." *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014).

[18] Smith raises arguments under: (A) the Fourth Amendment of the United States Constitution; and (B) Article 1, Section 11 of the Indiana Constitution.

A. *Fourth Amendment*

[19] Smith argues that Gaines's admission to having marijuana in her purse gave Trooper Wells a reasonable belief that he would find contraband in her purse, not anywhere in the rental vehicle. He argues that the problem with the trial court's analysis is that discovery of the marijuana along with Gaines's nervousness would not have caused a reasonable person to believe tearing apart the driver's door of a rental car would yield bricks of heroin. He also asserts that Trooper Wells did not focus on the door until the search was well under way. The State argues that Trooper Wells had probable cause to search the car based upon Gaines's admission to possessing marijuana in her purse and that Trooper Wells's observations of Gaines's nervousness added to the probable cause.

[20] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Thus, the Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures by the government. *Patterson v. State*, 958

N.E.2d 478, 482 (Ind. Ct. App. 2011). "Searches performed by government officials without warrants are per se unreasonable under the Fourth Amendment, subject to a 'few specifically established and well-delineated exceptions.'" *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967)). A search without a warrant requires the State to prove an exception to the warrant requirement applicable at the time of the search. *Id.*

[21] A search falls within the automobile exception when a vehicle is readily mobile and there is probable cause to believe it contains contraband or evidence of a crime. *Meister v. State*, 933 N.E.2d 875, 878-879 (Ind. 2010) (citing *Maryland v. Dyson*, 527 U.S. 465, 467, 119 S. Ct. 2013 (1999)). Where there is probable cause to search a vehicle, a search is not unreasonable if it is based on facts that would justify the issuance of a warrant, even though a warrant has not been obtained. *Id.* The automobile exception is grounded in two notions: "1) a vehicle is readily moved and therefore the evidence may disappear while a warrant is being obtained, and 2) citizens have lower expectations of privacy in their vehicles than in their homes." *State v. Hobbs*, 933 N.E.2d 1281, 1285 (Ind. 2010) (citing *California v. Carney*, 471 U.S. 386, 391, 105 S. Ct. 2066 (1985)). The United States Supreme Court has specifically stated that when there is probable cause that a vehicle contains evidence of a crime, a warrantless search of the vehicle does not violate the Fourth Amendment. *Meister*, 933 N.E.2d at 879 (citing *California v. Acevedo*, 500 U.S. 565, 569, 111 S. Ct. 1982 (1991)); *see also Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S. Ct. 2485, 2487 (1996) ("If

a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more." (citing *Carney*, 471 U.S. at 393, 105 S. Ct. 2066)).

[22] The Indiana Supreme Court has held:

> In light of the Supreme Court's recent emphatic statement in [*Maryland v.*] *Dyson* that the automobile exception "does not have a separate exigency requirement," 527 U.S. [465,] 467, 119 S. Ct. [2013,] 2014 [(1999)], we conclude that this exception to the warrant requirement under the Fourth Amendment does not require any additional consideration of the likelihood, under the circumstances, of a vehicle being driven away. Rather, we understand the "ready mobility" requirement of the automobile exception to mean that all operational, or potentially operational, motor vehicles are inherently mobile, and thus a vehicle that is temporarily in police control or otherwise confined is generally considered to be readily mobile and subject to the automobile exception to the warrant requirement if probable cause is present. This broad understanding of "readily mobile" is also consistent with the recognition that, for Fourth Amendment purposes, an individual is deemed to have a reduced expectation of privacy in an automobile. [*Pennsylvania v.*] *Labron*, 518 U.S. [938,] 940, 116 S. Ct. [2485,] 2487 [(1996)]; [*California v.*] *Carney*, 471 U.S. [386,] 393, 105 S. Ct. [2066,] 2070 [(1985)].

*Myers v. State*, 839 N.E.2d 1146, 1152 (Ind. 2005). *See also Hobbs*, 933 N.E.2d at 1286 (holding that the "automobile exception does not require that there be an imminent possibility the vehicle may be driven away").

[23] Further, "[f]acts necessary to demonstrate the existence of probable cause for a warrantless search are not materially different from those which would

authorize the issuance of a warrant if presented to a magistrate." *Meister*, 933 N.E.2d at 879 (quoting *Masterson v. State*, 843 N.E.2d 1001, 1004 (Ind. Ct. App. 2006), *trans. denied*). Probable cause to issue a search warrant exists where the facts and circumstances would lead a reasonably prudent person to believe that a search would uncover evidence of a crime. *Esquerdo v. State*, 640 N.E.2d 1023, 1029 (Ind. 1994).

[24] In *United States v. Ross*, the United States Supreme Court considered the extent to which police officers who have legitimately stopped an automobile and who have probable cause to believe that contraband is concealed somewhere within it may conduct a probing search of compartments and containers within the vehicle whose contents are not in plain view. 456 U.S. 798, 800, 102 S. Ct. 2157, 2160 (1982). In that case, an informant told the police that an individual was selling narcotics kept in the trunk. *Id.* at 800, 102 S. Ct. at 2160. The police stopped the vehicle, arrested and handcuffed the driver, Ross, took Ross's keys, opened the trunk, found a closed brown paper bag, opened the bag, and found a number of glassine bags containing a white powder. *Id.*

[25] On appeal, the Court held that the police "may conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant 'particularly describing the place to be searched.'" *Id.* (quoting U.S. CONST. amend. IV). The Court noted that "[d]uring virtually the entire history of our country – whether contraband was transported in a horse-drawn carriage, a 1921 roadster, or a modern automobile – it has been assumed that a lawful search of a vehicle

would include a search of any container that might conceal the object of the search." *Id.* at 820 n.26, 102 S. Ct. at 2170 n.26. The Court also held:

> A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. A warrant to open a footlocker to search for marihuana would also authorize the opening of packages found inside. *A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search.* When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, *or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.*

*Id.* at 820-821, 102 S. Ct. at 2170-2171 (emphases added and footnote omitted).

The Court noted:

> The practical considerations that justify a warrantless search of an automobile continue to apply until the entire search of the automobile and its contents has been completed. Arguably, the entire vehicle itself (including its upholstery) could be searched without a warrant, with all wrapped articles and containers found during that search then taken to a magistrate. But prohibiting police from opening immediately a container in which the object of the search is most likely to be found and instead forcing them first to comb the entire vehicle would actually exacerbate the intrusion on privacy interests. Moreover, until the container itself was opened the police could never be certain that the contraband was not secreted in a yet undiscovered portion of the

vehicle; thus in every case in which a container was found, the vehicle would need to be secured while a warrant was obtained. Such a requirement would be directly inconsistent with the rationale supporting the decisions in *Carroll* [*v. United States*, 267 U.S. 132, 45 S. Ct. 280 (1925)] and *Chambers* [*v. Maroney*, 399 U.S. 42, 90 S. Ct. 1975 (1970), *reh'g denied*].

*Id.* at 821 n.28, 102 S. Ct. at 2171 n.28. The Court went on to hold:

In the same manner, an individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband. Certainly the privacy interests in a car's trunk or glove compartment may be no less than those in a movable container. An individual undoubtedly has a significant interest that the upholstery of his automobile will not be ripped or a hidden compartment within it opened. These interests must yield to the authority of a search, however, which – in light of *Carroll* – does not itself require the prior approval of a magistrate. The scope of a warrantless search based on probable cause is no narrower – and no broader – than the scope of a search authorized by a warrant supported by probable cause. Only the prior approval of the magistrate is waived; the search otherwise is as the magistrate could authorize.

The scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found. Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase. Probable cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does not justify a search of the entire cab.

* * * * *

> If probable cause justifies the search of a lawfully stopped
> vehicle, it justifies the search of every part of the vehicle and its
> contents that may conceal the object of the search.

*Id.* at 823-825, 102 S. Ct. at 2172-2173 (footnote omitted).

[26] With respect to probable cause, the record reveals that Trooper Wells observed Gaines driving "like she was in a state of panic," that she was "very, very nervous" and breathing heavily, her hands were shaking uncontrollably, she was struggling for answers to very simple questions and changing them midsentence, her nervousness was "just getting worse and worse," and that he saw "her heart beating in her carotid." Transcript at 141-142, 145. Further, when Trooper Wells asked her if she was traveling with anything illegal, Gaines initially responded "No sir." Defendant's Exhibit B1 at 6:15-6:20. He asked her if she had any drugs with her, and Gaines then answered that she probably had a joint in her purse. Trooper Wells said: "[Y]ou know, this nervousness seems like more than that, is there anything else in the car[?]" Transcript at 189. Gaines looked away from him, stared at the car, and just shook her head. We also observe that Trooper Wells testified that when someone gives up a small amount of marijuana, it is for a reason, and that is to "keep something bigger hidden." *Id.* at 193. Trooper Wells found Gaines's purse and a small bag containing marijuana in the side pocket of a wallet on the passenger side of the seat. Based upon the circumstances including Gaines's extreme nervousness, her initial denial of traveling with anything illegal, her admission

that she had marijuana, and Trooper Wells's discovery of marijuana in her purse, we conclude that Trooper Wells had probable cause to search the vehicle. *See Meister*, 933 N.E.2d at 877, 879-880 (observing that after an officer received confirmation that a driver he was following was driving on a suspended license, defendant exited the truck, the officer patted down the defendant and found a hollowed-out pen containing "powdery looking residue inside of it," and he then conducted a warrantless search of the vehicle; holding that even if the testimony of the officer's knowledge of the defendant's recent history of possession of illegal drug possession was not considered, the pen and the powdery residue alone was sufficient to provide the requisite probable cause to search the vehicle; and concluding that the warrantless search was justified under the automobile exception).[2]

[27] To the extent Smith challenges the scope of the search and the search of the door, we note that Trooper Wells saw scratch marks in the paint and that the mounting hardware, screws, and the bolts in the door that hold the plastic shell to the metal shell were all missing paint indicating they had been "tooled up" as if someone had tampered with the panel, and that the window would not roll

---

[2] To the extent Smith relies upon *Sanders v. State*, we observe that case involved officers stopping a driver for failing to make two right turns without using his turn signal, and officers found marijuana inside an envelope in the car and found marijuana in the ash tray. *Sanders v. State*, 576 N.E.2d 1328, 1328 (Ind. Ct. App. 1991). One officer testified that they had information from a confidential informant that the defendant was possibly in possession of some narcotics, and another officer testified that they had information that the defendant was operating a specific vehicle. *Id.* at 1329. We observed that there was no attempt to establish the trustworthiness of the information allegedly provided by the informant and held that neither of the general, vague statements gave rise to the notion that the officers had probable cause to believe the defendant was in possession of drugs. *Id.* We also observed that the State did "not really argue the officers had probable cause to search the car." *Id.* at 1330. Given Trooper Wells's observations as well as Gaines's admission to the marijuana in the vehicle, we find *Sanders* distinguishable.

all the way down. *Id.* at 150. Under the circumstances, we cannot say that the search of the door was improper. *See Krise v. State*, 746 N.E.2d 957, 964 (Ind. 2001) ("[P]robable cause to search a vehicle and a warrant to search a home authorizes the search of every part of the vehicle or home and closed containers therein that may conceal the object of the search despite the suspect's wishes to place limitations and regardless of the officer's belief as to the type of the container to be searched.") (citing *Ross*, 456 U.S. at 825, 102 S. Ct. 2157; *Acevedo*, 500 U.S. at 572; 111 S. Ct. 1982).

[28] Smith argues that "[r]ather than retrieving [Gaines's] purse and verifying the presence of the joint, Trooper Wells began an extensive search of the car during which he opened the trunk, peered under the hood, looked around inside and ultimately got out his toolkit and started tearing apart the door." Appellant's Brief at 22 (citing Defendant's Exhibit B1). However, at trial, Trooper Wells testified that the first place he checked was the trunk and that he did not find anything. When asked what happened next, he mentioned Gaines's purse on the passenger side of the seat and that he found a small bag containing marijuana inside. The video of the stop, Defendant's Exhibit B1, supports Trooper Wells's testimony that he initially searched the trunk and then

proceeded to the front passenger side. Accordingly, the record reveals that Trooper Wells discovered the marijuana prior to searching the door.[3]

B. *Indiana Constitution*

Smith asserts that to the extent he failed to specifically raise the Indiana Constitution, he addresses it as fundamental error and that fundamental error applies because all parties agreed the State had no chance of conviction without the heroin. He states that the degree of intrusion was great, that Gaines was going to jail once Trooper Wells discovered the marijuana, and that law enforcement had no compelling need to disassemble the car door while it sat on the side of the highway because the car would have been towed. The State points out that the trial court's finding that the search was permissible under Article 1, Section 11 of the Indiana Constitution was not responsive to any contentions made by Smith, and that regardless, the search complied with Indiana's constitutional protections against unreasonable search and seizure.

The Indiana Supreme Court has held even if evidence was obtained in violation of constitutional protections against unlawful searches and seizures, its introduction at trial "does not elevate the issue to the status of fundamental error that may be raised for the first time on appeal." *Swinehart v. State*, 268 Ind. 460, 466-467, 376 N.E.2d 486, 491 (1978); *see also Covelli v. State*, 579

---

[3] Smith does not develop an argument regarding the impact of Trooper Wells searching the trunk prior to finding the marijuana or argue that any evidence was improperly seized prior to Trooper Wells discovering the marijuana.

N.E.2d 466, 471 (Ind. Ct. App. 1991), *trans. denied*. This is consistent with the Court's more recent pronouncement that "the exclusionary rule that prohibits introduction into evidence of unlawfully seized materials is an example of a rule that does not go to the fairness of the trial." *Membres v. State*, 889 N.E.2d 265, 272 (Ind. 2008), *reh'g denied*. In other words, the products of unlawful searches and seizures are not excluded because they are unreliable or immaterial or unduly prejudicial evidence, but only because it is an effective means of deterring improper intrusions into the privacy of all citizens. *Id.*

[31]     More recently, in *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010), *reh'g denied*, the Indiana Supreme Court indicated that there may be some occasions when an illegal seizure of evidence may amount to fundamental error. In *Brown*, the Court held that "an error in ruling on a motion to exclude improperly seized evidence is not per se fundamental error." 929 N.E.2d at 207. "Indeed, because improperly seized evidence is frequently highly relevant, its admission ordinarily does not cause us to question guilt." *Id.* "We do not consider that admission of unlawfully seized evidence ipso facto requires reversal." *Id.* The Court observed that there was no claim of fabrication of evidence or willful malfeasance on the part of the investigating officers and no contention that the evidence was not what it appeared to be and concluded that "[i]n short, the claimed error does not rise to the level of fundamental error." *Id.* There are no such claims in this case. Thus, we cannot say that the introduction of evidence seized from the vehicle constituted fundamental error in the context of the Indiana Constitution. *See id.*

II.

[32] The next issue is whether Smith's sentence is inappropriate in light of the nature of the offense and his character. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). "[A]ppellate review should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Cardwell v. State*, 895 N.E.2d 1219, 1225, (Ind. 2008).

[33] Smith argues that all of his drug-related activity occurred in a two-year period between 2010 and 2012 when he was in his early thirties, that his federal conviction resulted from years of intense scrutiny by the FBI who became suspicious of him in 2010, and that piling on an additional fifty years for the same sort of behavior renders the sentence in this case both punitive and ineffective. He also points out that though he could have received a life sentence in his federal case, the government did not recommend a life sentence

in that case, and that sentencing him to an additional fifty years in Indiana is not warranted.[4]

[34] The State argues that the trial court identified multiple valid aggravating circumstances and any of them would support Smith's fifty-year sentence as well as the trial court's order that it be served consecutive to his federal sentence. The State contends that there was no evidence in the record that the federal court actually sentenced Smith based on this case and that, even if it had, the trial court's order that his sentence be served consecutively was not an abuse of discretion. The State asserts that the offense involved over 1,000 times the amount of heroin to make it punishable as a class A felony and that Smith's character is that of an unrepentant chronic dealer of narcotics on a large scale undaunted by numerous convictions.

[35] Our review of the nature of the offense reveals that Smith conspired to deal heroin as a class A felony in 2012 and paid Gaines to transport heroin for him. Our review of the character of the offender reveals that Smith, who was born in 1979, was convicted of manufacture / delivery of a controlled substance in 1998 in Illinois, "felon possess/use weapon/firearm" in 2000 in Illinois, possession of a controlled substance in 2004 in Illinois, drug trafficking in 2006 in Ohio,

---

[4] To the extent Smith cites Article 1, Section 18, of the Indiana Constitution, which provides that "[t]he penal code shall be founded on the principles of reformation, and not of vindictive justice," we observe that the Indiana Supreme Court has held that "particularized, individual applications are not reviewable under Article 1, Section 18 because Section 18 applies to the penal code as a whole and does not protect fact-specific challenges." *Ratliff v. Cohn*, 693 N.E.2d 530, 542 (Ind. 1998), *reh'g denied*.

and possession of a controlled substance and use of a weapon by a felon in 2007 in Illinois.[5] Smith was also found guilty of four counts of distribution of a schedule I controlled substance in Illinois for events related to the distribution of heroin in 2010 and ordered to serve 216 months or eighteen years. The presentence investigation report lists Smith's criminal history domain level as moderate. Smith reported that he has five children and has always financially taken care of them. He reported that he was involved in a gang between ages fourteen and twenty-two, but that he is no longer in a gang. He reported receiving his GED and taking business in vocational school and that he finished real estate classes while incarcerated. His overall risk assessment score puts him in the moderate risk category to reoffend.

[36] After due consideration and under the circumstances, we conclude that the imposition of the maximum sentence to be served consecutive to the sentence in federal court is not inappropriate.

## *Conclusion*

[37] For the foregoing reasons, we affirm Smith's conviction and sentence for conspiracy to commit dealing in heroin as a class A felony.

---

[5] The presentence investigation report also reveals that Smith was charged with disorderly conduct in 1995, burglary and possession of a controlled substance in 1996, battery and damaging property in 1999, possession of cannabis in 2001, aggravated assault and domestic battery in 2002, and manufacture/delivery of cannabis in 2003. The report either does not list the disposition for these offenses, indicates that some were "stricken off with leave to reinstate," or lists "nolle prosequi." Appellant's Appendix Vol. III at 110-111.

[38]    Affirmed.

Robb, J., and Mathias, J., concur.